**JOSEPH BANCROFT & SONS CO.**

v.

**SHELLEY KNITTING MILLS, INC., Appellant.**

No. 12774.

United States Court of Appeals Third Circuit.

Argued March 5, 1959.

Decided July 2, 1959.

**570**

Harry Shapiro, Philadelphia, Pa., for appellant.

Alfred C. Aurich, Philadelphia, Pa. (Robert T. McCracken, C. Russell Phillips, Andrew R. Klein, Philadelphia, Pa., on the brief), for appellee.

Before GOODRICH, KALODNER and HASTIE, Circuit Judges.

KALODNER, Circuit Judge.

Two issues are presented in this appeal from the District Court's Order granting a preliminary injunction.

They are:

(1) Did the District Court abuse its discretion in granting a preliminary injunction?

(2) Was the sweep of the preliminary injunction so broad as to constitute reversible error?

The facts, necessary to disposition, may be summarized as follows:[1]

Plaintiff, Joseph Bancroft & Sons Co., ("Bancroft"), a Delaware corporation having its principal place of business in that state, is the owner of the trademark "Ban-Lon",[2] characterizing a crimped nylon yarn. Bancroft also holds a license from a patentee of machinery for crimping nylon yarn which is not here involved. It licensed numerous yarn spinners (throwsters) to crimp nylon yarn. It neither invented nylon filament yarn nor owns exclusive rights to crimped nylon filament yarn. Bancroft itself manufactures only from 1,000 to 2,000 pounds of crimped nylon a year.

Bancroft also licensed knitters who purchased crimped nylon yarn from its licensed spinners. These licenses permitted the knitters to use on their varied products the name "Ban-Lon" on hang tags displaying also the picture of a kitten on a pillow, and on labels sewn into the products. Three hundred of four hundred knitters licensed by Bancroft manufactured sweaters. Bancroft itself does not manufacture sweaters.

The licenses to knitters specified conditions under which they could use the "Ban-Lon" trademark.

Defendant, Shelley Knitting Mills, Inc. ("Shelley"), is a corporation of the State of Pennsylvania having its principal place of business in that State. It manufactures sweaters. Under an oral understanding in the early part of 1955, Shelley was granted permission by Bancroft to use the trademark "Ban-Lon" on its sweaters, and received written authorization to do so by letter dated November 11, 1955. Subsequently Bancroft and Shelley entered into one-year license agreements on July 18, 1956 and August 6, 1957. Both license agreements had expired at the time of the entry of the District Court's Order of September 11, 1958 here at issue. The August 6, 1957

---

1. The District Court's opinion is unreported. It made sixty-six Findings of Fact and stated eleven Conclusions of Law.

2. Trademark Registration No. 621,848, issued February 21, 1956, following application filed June 2, 1955.

agreement, however, was still in effect when the action which resulted in this appeal was filed on July 26, 1958.

The 1957 agreement conditioned Shelley's use of the "Ban-Lon" trademark during its term upon its maintenance of quality standards therein specified by Bancroft. It provided, in substance, among other things, that Shelley (1) submit to Bancroft two sweaters of each style proposed to be manufactured by it for testing and quality control evaluation; (2) sell under the "Ban-Lon" trademark only sweaters equal to the standards of the sample sweaters previously submitted for approval and approved; (3) ensure that its sweaters showed "satisfactory workmanship, appearance, hand, and shall be satisfactory construction for the type of stitch, yarn, size and end use planned, based upon the judgment of Joseph Bancroft and Sons Company", and, (4) use its own trademark "in prominent association with" the "Ban-Lon" trademark whenever the latter was used.

In April 1957, while the 1956 license agreement was still in effect, Bancroft notified Shelley that it would be required to use a minimum of 28 stitches per inch in the manufacture of any new styles after that date. Prior to April 1957 Bancroft had not specified any minimum stitch requirement. The 28-stitch count was specified because Bancroft's research staff had ascertained that it would eliminate undesirable excessive pilling[3] and fuzzing.

After the August 6, 1957 license agreement, here involved, was signed, Bancroft again, between August 26, 1957 and March 13, 1958, on five occasions, advised Shelley of its specification of the 28-stitch count. During this period, and a later date, May 28, 1958, Shelley submitted sample sweaters to Bancroft for approval which met its 28-stitch count requirements, and which were approved.

Complaining that Shelley was selling, under the "Ban-Lon" trademark, sweaters not in conformity with the samples submitted or its quality control standards, Bancroft filed suit on July 26, 1958, seeking preliminary and final injunctions and other relief. Three causes of action were stated: (1) infringement of Bancroft's trademark "Ban-Lon"; (2) unfair competition, and, (3) breach of contract.

In its complaint Bancroft specifically charged Shelley with violating prescribed quality control standards in that it failed to conform to the 28-stitch count and size requirements. It also alleged use of unauthorized hang tags.

At the hearings upon preliminary injunction, Bancroft offered in evidence samples of Shelley's sweaters which had been approved upon submission as containing the 28-stitch count. It also adduced testimony that on February 21, 1958, an examination of fourteen sweaters, selected at random, in Shelley's inventory, disclosed that ten had a stitch count varying from 24 to 26 stitches per inch. It was further testified that in July and August 1958 Bancroft purchased fourteen of Shelley's sweaters at various stores throughout the country; that thirteen of the sweaters, offered in evidence, had less than a 28-stitch count; their labeled sizes and measurements varied from .2 of an inch (acceptable to Bancroft), to 1.7 of an inch, and unauthorized hang tags[4] were attached to the sweaters.

With respect to the thirteen sweaters Bancroft's witnesses were unable to say whether they had been manufactured subsequent to specification of the 28-stitch count, and admitted that their manufacture could have preceded it.

It was also testified in Bancroft's behalf that it had spent more than $1,000,-000 in advertising its trademark "Ban-

---

3. Pilling is a roughing-up in which the fiber ends form little balls, break and curl.

4. The hang tags displayed a kitten on a pillow (kitten label) with a "balloon" at the top. They did not carry Shelley's mark, as required, and had been disapproved by Bancroft.

Lon" since 1954 and that in addition, fiber producers, spinners, sweater manufacturers and stores, had expended several times that amount in advertising the same trademark. Bancroft's testimony also established that licensed spinners paid Bancroft a royalty based on the market price of the basic nylon filament which they processed; licensed knitters, such as Shelley, paid no royalty to Bancroft. Spinners, as well as knitters, however, were required by their licenses to maintain standards of quality established by Bancroft in order to use its trademark. Quality standards were changed from time to time by Bancroft in accordance with research programs which it pursued at an annual cost of $150,000.

Shelley, in its behalf, adduced testimony, which may be summarized as follows: it had manufactured under its license agreements with Bancroft, more than 2,000,000 sweaters bearing the sewed-in label and hang tag "Ban-Lon" trademark and only eight sweaters had been returned by purchasers; in order to manufacture these sweaters Shelley purchased $500,000 new equipment in 1955, 1956 and 1957 and bought approximately $2,884,000 of "Ban-Lon" yarn from licensed spinners during the years stated; it spent $50,000 in 1956 and $75,000 in 1957 advertising the name "Ban-Lon"; it was impossible for Shelley to meet Bancroft's 28-stitch count and manufacture sweaters profitably on its machines; if Shelley were to make sweaters with a 28-stitch count on its machines it could not obtain the proper size measurement for them; Bancroft's specification of a 28-stitch count was "not based on any substantial factual test"; Shelley's sweaters, even though they contained less than a 28-stitch count, were good and marketable; subsequent to the filing of Bancroft's suit on July 26, 1958 Shelley had on hand, on July 31, 1958, 28,449 dozen sweaters, manufactured at a cost of approximately $948,000; the August 6, 1957 license agreement authorized Shelley to use its own trademarks "Temi" and "Claremont" in association with Bancroft's trademark "Ban-Lon"; Shelley was "one of the largest Ban-Lon producers"; and, finally, Shelley's customers (jobbers and retailers) never specified any stitch count.

The District Court, after hearings on September 4th and 6th, 1958, rendered its Opinion on September 11th in which it adopted all the Findings of Fact and Conclusions of Law proposed by Bancroft and, with modifications, several Findings of Fact and Conclusions of Law submitted by Shelley. In addition, the District Court stated some of its own Findings of Fact and Conclusions of Law. Simultaneously, with the filing of its Opinion, the District Court entered an Order granting the preliminary injunction in the following terms:

"* * * It Is Ordered, Adjudged and Decreed that the defendant, its officers, servants, employees, attorneys, agents, and each of them, be enjoined preliminarily, and until further order of this court, from

"(a) using the trademark 'Ban-Lon' on or with reference to any products which are of quality inferior to the standards prescribed by plaintiff and which have not been approved by plaintiff;

"(b) directly and indirectly distributing, selling or advertising such inferior quality products under or by reference to the trademark 'Ban-Lon';

"(c) directly or indirectly distributing, selling or advertising any products bearing any mark or name which colorably imitates plaintiff's trademark 'Ban-Lon'; or

"(d) using any labels or hang tags bearing plaintiff's trademark 'Ban-Lon' unless and until approval for the use thereof shall first have been obtained from plaintiff;

conditioned upon the filing by plaintiff of a bond in the amount of $75,-000.00;

"And It Is Further Ordered that defendant's Motion for Preliminary

Injunction filed August 4, 1958, is Denied."

The preliminary injunction was in exact terms submitted by Bancroft except that the amount of the bond was fixed at $75,000 instead of $50,000.

Highlights of the District Court's fact-findings, Conclusions of Law and Discussion, may be summarized as follows:

Jurisdiction existed over the parties and subject matter by reason of the trademark and diversity laws; the trademark "Ban-Lon" is extensively used in interstate commerce and is of substantial value to Bancroft; licensees of Bancroft were subject to its quality control specifications; the specifications, particularly as to the 28-stitch count were reasonable; less than a 28-stitch count causes, in sweaters, "excessive pilling and fuzzing"; purchasers of sweaters (jobbers, retail stores and consumers) do not inquire as to the number of stitches per inch in a sweater; sweaters which "excessively fuzz and pill after wearing" cause consumer dissatisfaction; Shelley's manufacture and sale of substandard sweaters under the "Ban-Lon" trademark breached its license agreement and infringed the trademark; continued sales would cause irreparable injury to Bancroft; Shelley attached hang tags to its sweaters which had not received Bancroft's approval and thereby breached its license; Shelley's use of Bancroft's trademark "Ban-Lon" constituted unfair competition; Shelley's knitting machines could not profitably be used to comply with the 28-stitch count specification; "pilling in textured nylon filament yarn probably results because of the break of individual nylon fibres", and, such breaking "may be caused by abrasion, tearing, or unduly stretching of one or more individual fibres of filaments or other causes"; Shelley manufactured and sold, during the existence of its license agreements more than 2,000,000 sweaters under the "Ban-Lon" trademark; the sweaters were of "good and marketable

quality"; Shelley did not use Bancroft's trademark "in such manner as to deceive the public"; Shelley "has not shown how many sweaters it had on hand at this time [September 11, 1958—date of the adjudication and Order] and its evidence indicates that the failure of defendant [Shelley] to use the name 'Ban-Lon' and plaintiff's [Bancroft's] related mark will not cause it *substantial damage*". (Emphasis supplied.)

With respect to the District Court's adjudication and Order Shelley makes these contentions:

(1) The District Court abused its discretion in granting a preliminary injunction because there was no evidence of threatened irreparable injury to Bancroft should it be denied.

(2) The sweeping provisions of the preliminary injunction restraining Shelley from making any reference to the trademark "Ban-Lon" in the advertising or sale of its sweaters enjoined it from even stating that the sweaters were made of "Ban-Lon" yarn though they were in fact made of such yarn and accordingly the preliminary injunction was invalid under the doctrine enunciated in Prestonettes, Inc. v. Coty, 1924, 264 U.S. 359, 44 S.Ct. 350, 68 L.Ed. 731.

Bancroft, in reply, asserts that the District Court properly exercised its discretion in granting the preliminary injunction, and that its provisions are valid.

Taking first Shelley's contention that the District Court abused its discretion in granting a preliminary injunction:

Applicable to that contention are these well-settled principles:

The granting or denying of a preliminary injunction rests in the sound judicial discretion of the trial court and will not be disturbed upon appeal "unless contrary to some rule of equity, or the result of an improvident exercise of judicial discretion".[5]

5. Deckert v. Independence Shares Corp., 1940, 311 U.S. 282, 290, 61 S.Ct. 229, 85 L.Ed. 189; Meccano, Limited v. John Wanamaker, 1920, 253 U.S. 136, 141, 40 S.Ct. 463, 64 L.Ed. 822; American Ice Co. v. Royal Petroleum Corp., 3 Cir., 1958, 261 F.2d 365, 368.

■ The applicant for a preliminary injunction bears the burden of establishing a right to such injunctive relief and that irreparable injury will result to him if it is not granted.[6]

■ "The award of an interlocutory injunction by courts of equity has never been regarded as strictly a matter of right, *even though irreparable injury may otherwise result to the plaintiff.* \* \* \* Even in suits in which only private interests are involved the award is a matter of sound judicial discretion, *in the exercise of which the court balances the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction.* \* \* \*" (Emphasis supplied.)[7]

■ The equity court's power to issue an interlocutory injunction "which compels the defendant, in order to obey it, to take affirmative action should be sparingly exercised".[8]

Applying the principles stated to the instant case we are of the opinion that the District Court improvidently exercised its discretion in granting the motion for the preliminary injunction.

We do so for "very persuasive reason[s]" in this "unusual case".[9] [261 F. 2d at page 368.]

■ On review of the record we can find no "irreparable injury" threatening Bancroft which would warrant issuance of a preliminary injunction for reasons later stated. Moreover, even assuming that some injury might have resulted to Bancroft by reason of the denial of a preliminary injunction, the District Court failed to "balance the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction", as is required in the exercise "of sound judicial discretion", under the cases earlier cited.

First, assuming the correctness of the District Court's factual finding that Shelley failed to comply with Bancroft's 28-stitch count, there isn't a single shred of evidence in the record that (1) there was any adverse effect by reason of such failure upon the sale of "Ban-Lon" yarn by its licensed spinners from whom Bancroft received its royalties or upon public acceptance of the manufactured products of its 400 licensed knitters; (2) there was no evidence of consumer dissatisfaction with Shelley's sweaters and consequent damage to Bancroft's trademark; (3) there was in the District Court's own words an "absence of evidence" as to the size of Shelley's inventory at the time of the issuance of the preliminary injunction; and, (4) there was no evidence as to whether whatever inventory Shelley had on hand at the time of the issuance of the injunction had been manufactured, prior, or subsequent to, specification of the 28-stitch count.

Second, the record affirmatively established that (1) Shelley's sweaters, even though lacking the 28-stitch count, were, in the District Court's own words, "of good and marketable quality"; and, (2) Bancroft's trademark was, again in the District Court's own words, "not used in such manner as to deceive the public". Further, the evidence clearly established that Bancroft's business had expanded tremendously during the period in which Shelley was licensed; Shelley's own purchases of "Ban-Lon" yarn from Bancroft's licensed spinners increased from $648,000 in 1956 to $1,789,000 in 1957;

6. United States v. W. T. Grant Co., 1953, 345 U.S. 629, 633, 73 S.Ct. 894, 97 L.Ed. 1303; Sims v. Greene, 3 Cir., 1947, 161 F.2d 87, 89.

7. Yakus v. United States, 1944, 321 U.S. 414, 440, 64 S.Ct. 660, 674, 88 L.Ed. 834; Rice & Adams Corporation v. Lathrop, 1929, 278 U.S. 509, 514, 49 S.Ct. 220, 73 L.Ed. 480; Meccano, Ltd. v. John Wanamaker, supra, note 5; Hamilton Watch Co. v. Benrus Watch Co., 2 Cir., 1953, 206 F.2d 738, 743.

8. 7 Moore's Federal Practice, 2d Ed. 1955, par. 65.04 [1], and the cases therein cited.

9. American Ice Co. v. Royal Petroleum Corp., supra, note 5.

its undisputed total purchases during the life of its licenses aggregated $2,884,000, and it manufactured approximately 2,-000,000 sweaters during that period. That Shelley's sweaters met with public acceptance which was not diminished by reason of its failure to comply with the 28-stitch count is evidenced by the fact that only eight were ever returned by consumers to Bancroft as unsatisfactory —six because of excessive pilling and two because neckbands became loose during wear. Only eight sweaters were ever returned to Shelley. These statistics are significant on the score of Bancroft's contention, below and here, and the District Court's finding, that irreparable injury was threatened to Bancroft should Shelley be permitted to sell sweaters with less than a 28-stitch count. Pertinent to these facts is the settled rule that "the character of the past violations", i. e., failure to comply with the 28-stitch count, must be considered in acting upon applications for injunctive relief. United States v. W. T. Grant Co., 1953, 345 U.S. 629, 633, 73 S.Ct. 894, 898, 97 L.Ed. 1303.

This too must be said.

The District Court, in the exercise of its discretion, failed to "balance the conveniences of the parties and possible injuries to them according as they may be affected by the granting or withholding of the injunction". (See cases cited note 7.)

According to Shelley's contention it had on hand an inventory of $948,000 (at cost) at the time of the hearing on the application for the injunction on September 6th. It offered in testimony its inventory statement showing 28,449 dozen sweaters—manufactured at a cost of $33.33 per dozen—on hand on July 31, 1958, which was five days after Bancroft's action was filed. That testimony was undisputed. The testimony, however, is hazy as to whether the July 31st inventory was still on hand on September 6th and no effort was made by either party or the District Court to clarify it. It is reasonable to infer that so large an inventory could not have been disposed of between July 31st and September 6th in view of the fact that Bancroft's suit had been publicized. In any event, the record fails to offer substantial basis for the District Court's apparent conclusion that the inventory had been drastically reduced. In fact the District Court did state that "Defendant has not shown how many sweaters it had on hand at this time".

On the score of "balancing the convenience of the parties" as they might be affected by an injunction it is apparent that issuance of the injunction would drastically affect Shelley since it prevented disposition of its inventory during its pendency.

We can take judicial notice, as the District Court should have, that manufacturers' sales of sweaters are seasonal and styles of sweaters change, so that delay in their availability to consumers will result in irreparable damage.

On the other hand, denial of a preliminary injunction could not reasonably be determined to result in "irreparable damage" to Bancroft. Its business, as earlier stated, had expanded during the period Shelley was allegedly manufacturing and selling sweaters with less than a 28-stitch count. As the District Court found "Plaintiff has built up and now has a large and profitable business and good will * * *". Since Bancroft's business flourished while Shelley was making and selling sweaters with less than a 28-stitch count a determination that it would suffer "irreparable damage" by reason of further such sales is without substantial basis. Even, assuming that Bancroft's business would be damaged to some extent by denial of an injunction, its injury would not be comparable to that suffered by Shelley by reason of the issuance of the injunction here involved.

The undisputed fact that purchasers of sweaters, jobbers, retailers and consumers, never inquired as to the stitch-count or evidenced any interest therein,

and the District Court's finding that Shelley's sweaters were "good and marketable" indicate that Bancroft would not suffer irreparable injury by reason of the denial of its application for a preliminary injunction and resulting sale by Shelley of such inventory as remained when the District Court's Order issued.

What we have said makes it unnecessary to discuss Shelley's second point as to the erroneous sweep of the preliminary injunction.

For the reasons stated the Order of the District Court will be reversed and the cause remanded with instructions to proceed in accordance with this Opinion.