**PURITAN SPORTSWEAR CORP., a corporation, Plaintiff,**

v.

**Herb SHURE, individually and doing business as H & M Distributing Company and H & M Distributing, Inc., a corporation, Defendants.**

**Civ. A. No. 69–954.**

United States District Court
W. D. Pennsylvania.

Dec. 18, 1969.

---

378

Simpson, Thacher & Bartlett, New York City, Reed, Smith, Shaw & McClay, Pittsburgh, Pa., for plaintiff.

Rose, Schmidt & Dixon, Pittsburgh, Pa., Zeman & Zeman, Canonsburg. Pa., for defendants.

OPINION

**GOURLEY, District Judge.**

This is an action for trademark infringement which the Court has heard upon plaintiff's request for a preliminary injunction. The Complaint alleges infringement of trademark, unfair competition and disparagement of plaintiff's goods and requests an injunction, accounting for profits and damages. A Temporary Restraining Order was entered with the consent of defendants on August 14, 1969. Defendants in their Answer deny infringement and assert defenses of estoppel, unclean hands, and misuse of trademark by plaintiff. In addition, defendants assert counterclaims for alleged violation of the antitrust laws by plaintiff, defamation of defendants' business reputation, and slander per se.

The Court has conducted most prolonged and extensive hearings, considered the briefs and arguments of counsel, and studied the existing law applicable to the factual and legal issues presented.

Defendants' Counterclaim grounded upon alleged violation of the antitrust laws has been severed from their defenses of unclean hands and misuse of trademark, which are based in part upon alleged anti-competitive practices of plaintiff in violation of the antitrust laws. Evidence on the latter was permitted solely in defense to the request for preliminary injunction.

Counsel for each of the parties have most ably, conscientiously, and thoroughly presented their respective clients' causes. I do not believe the evidence establishes that the plaintiff will suffer immediate irreparable injury or that the plaintiff is reasonably likely to succeed in establishing its cause on the merits. The application for preliminary injunction is denied. The Court enters the following Findings of Fact and Conclusions of Law.

FINDINGS OF FACT

*Jurisdiction and Parties*

1. Plaintiff is a corporation duly organized and existing under the laws of the State of Delaware, is authorized to do business in the Commonwealth of Pennsylvania, and maintains its general business offices in the City of Altoona, County of Blair, Commonwealth of Pennsylvania, within the Western District of Pennsylvania.

2. Defendant Herbert J. Shure is an individual residing at 169 LeMoyne Avenue in the City of Washington, County of Washington, Commonwealth of Pennsylvania, within the Western District of Pennsylvania.

3. In 1956 Herbert J. Shure started into the business of buying and selling clothing merchandise at wholesale, sometimes using the name H&M Distributing.

4. On or about June 4, 1969 Herbert J. Shure caused to be incorporated defendant H&M Distributing, Inc., a Pennsylvania corporation, organized and existing under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 40 West Chestnut Street, in the City of Washington, County of Washington, Commonwealth of Pennsylvania, within the Western District of Pennsylvania. Herbert J. Shure is the owner of seventy percent of H&M Distributing, Inc.; his wife, Marilyn Shure, is the owner of the remaining thirty percent thereof.

5. Plaintiff and its predecessors, since 1909, have been engaged in Pennsylvania and elsewhere in the United States in the manufacture of certain sportswear clothing and the wholesale sale of said sportswear clothing either which plaintiff has manufactured itself or which plaintiff has had manufactured for it by others.

*Validity of Trademark and
Protection Afforded
Thereby*

6. The single word "Puritan" has been used by plaintiff in connection with

the sale of said sportswear, including men's and boy's sweaters and sport shirts, at least since July 26, 1963; said word has been used in connection with plaintiff's national advertising of said sportswear at least since April 18, 1967; and said word has been used upon labels in plaintiff's sportswear at least since June 19, 1969 and probably for a considerably longer period of time. (Pl. Exs. X–1, Y–51, D through M)

7. The trademark "Puritan Sportswear, the Choice of All Americans," in a configuration with the words "Puritan Sportswear" in prominent script and the words "the Choice of All Americans" in subdued fine print, was submitted by plaintiff's predecessor to the United States Patent Office by application dated December 11, 1950 and was duly registered on the Principal Register at Registration No. 587,494 on March 30, 1954. Said Registration contained a disclaimer of the words "Sportswear" and "The Choice of All Americans," apart from the mark as shown. (Pl. Ex. X)

8. Two other trademarks subsequently have been submitted to the United States Patent Office by plaintiff: the first is the sole word "Puritan" configured in a distinctive print and grounded upon a simple banner-like background, the application for which was made July 26, 1963 and registration of which was entered on the Principal Register at Registration Number 867,573 on April 1, 1969; and the second being the sole word "Puritan" in somewhat less distinctive print and absent background, application for which was made on April 14, 1966 and registration of which was granted upon the Principal Register at Registration Number 878,710 on October 14, 1969. (Pl. Exs. X–1, X–2)

9. Among the items of men's sportswear sold at wholesale by plaintiff under the "Puritan" name and trademark in 1968 and 1969, up to the present time, have been two styles of sweatershirts

knitted from Ban-Lon yarn[1], one a mock turtleneck style denominated "Brookfair" by plaintiff and the other a collar and placket style denominated "Brookview" by plaintiff.

### Infringement and Defenses Thereto

10. During 1968 plaintiff sold at wholesale a total of 107,105 dozen Brookfair and Brookview sweatershirts and plaintiff estimates that it will sell a total of 105,185 dozen of said two styles during 1969. (Pl. Exs. Y–103, Y–104)

11. While plaintiff manufactures in its own plants approximately seventy per cent of the sportswear sold by it at wholesale, it utilizes outside contractors to manufacture approximately thirty per cent of said sportswear.

12. At some time in 1967, plaintiff arranged with one Sigo or Sego Corporation (hereinafter called Sigo), a corporation incorporated in Puerto Rico, that Sigo would manufacture on behalf of plaintiff certain unfinished knitted Ban-Lon sweatershirts at Sigo's location in Yauco, Puerto Rico, which unfinished sweatershirts were then to be shipped to Puritana, a subsidiary of plaintiff located in Aguas Buenas, Puerto Rico, for finishing. (Ct. Ex. 1, R. 1085–1087)

13. Late in 1967 or early in 1968, Sigo was in the process of expanding its manufacturing operations at Yauco, Puerto Rico, created or acquired a wholly owned subsidiary known as Tafgo Corporation (hereinafter called Tafgo) for the purpose of operating in common with Sigo the plant at Yauco and created facilities at Yauco which would enable Tafgo and/or Sigo to manufacture for plaintiff a fully finished garment which would require no further finishing by plaintiff or plaintiff's subsidiary Puritana. (Pl. Ex. W–1, Deft. Exs. 5, 5–a, 5–b)

14. At some time in 1968, plaintiff and Sigo arranged that Tafgo would succeed Sigo as a manufacturer for plain-

[1]. Ban-Lon is a trademark owned by a corporation other than plaintiff. Said corporation manufactures and/or licenses to others the manufacture of crimped nylon yarn under the Ban-Lon mark.

tiff and would manufacture for plaintiff and ship directly to plaintiff's plant in Altoona, Pennsylvania, a fully finished, labeled and packaged garment, thus overtaking the final finishing process originally performed by plaintiff's subsidiary Puritana in Aguas Buenas, Puerto Rico. (Pl. Ex. W-1, Deft. Exs. 5, 5-a, 5-b)

15. Most if not all of plaintiff's further dealings were conducted nominally with Tafgo.

16. Neither at the outset of plaintiff's business relationship with Sigo in 1967 nor afterward during the course of plaintiff's continuing business relationship with Sigo and then Tafgo, did plaintiff ever enter into a formal written contract with Tafgo and/or Sigo governing the terms of their continuing business relationship. The contractual agreement was achieved entirely through the vehicles of contract specification sheets, oral communications, letters, invoices, and actions of plaintiff and Tafgo and/or Sigo in response to and/or in reliance upon the aforementioned written or oral communications. (R. 1085-87)

17. Through the aforementioned oral and written communications, and actions of plaintiff and Sigo and/or Tafgo in the business relationship, a certain basic understanding or agreement was reached between the parties in the early part of 1968.

18. In early 1968 it was understood by plaintiff and Tafgo that Tafgo was to manufacture and, in the first instance, to send only to plaintiff fully finished knitted Ban-Lon sweatershirts which were to be in accordance with plaintiff's specifications as to size, style and other characteristics of the garment. (R. 1639-40)

19. To facilitate the most economic and expeditious manufacture of a fully finished garment ready for prompt sale at wholesale by plaintiff, it was understood that plaintiff would send to Tafgo, and it did so send to Tafgo, original Puritan labels and tags and all other "findings" such as tissue paper, pins and polyethylene packaging bags which Tafgo was to place, and did so place, upon the fully finished sweatershirts in order that plaintiff could receive said garments from Tafgo ready for prompt wholesale sale by it without the necessity of expending further labor of its own on the pre-packaged garments. Tafgo was charged although not billed by plaintiff for all such labels and other findings sent to Tafgo and Tafgo charged back the sum paid for said findings only if and when plaintiff accepted fully finished garments containing findings upon them. (R. 1233-36)

20. In early 1968, plaintiff and Tafgo reached an agreement or understanding that when any fully finished, labeled and packaged sweatershirts shipped from Tafgo to plaintiff were found by plaintiff upon inspection to be second quality, said sweatershirts would be returned to Tafgo, whereupon Tafgo could accumulate the goods so returned and dispose of them on its own in commerce or, if plaintiff saw fit at a given time, Tafgo with plaintiff's agreement would have the option of sending them to plaintiff for plaintiff's own disposition. (Deft. Ex. 3)

21. Plaintiff itself deemed said agreement or understanding sufficiently important to merit its reduction to writing in a letter dated February 5, 1968 to Mr. Sidney Gould, President of Tafgo, and it was intended that said letter would establish the understanding between plaintiff and Tafgo concerning any and all garments which might be returned as second quality by plaintiff to Tafgo during the course of their continuing business relationship.

22. The aforementioned agreement granted authority to Tafgo to dispose of any returned garments in commerce without limitation as to the manner of disposition or condition in which the garments were to be sold by Tafgo.

23. Under the aforementioned agreement, Tafgo was not obligated to attempt to repair and return any garments or garment-lots returned by plaintiff to

Tafgo as failing to meet plaintiff's quality control specifications.

24. Acting under, and in reliance upon, the understanding set forth above, Tafgo manufactured for plaintiff, during 1968 and early 1969, full-fashioned Ban-Lon knitted sweatershirts in two particular styles, among others, one being the "Brookfair", with a "mock turtle-neck" and the second being the "Brookview", with a placket collar.

25. To manufacture knitted Ban-Lon sweatershirts, plaintiff has at various times engaged as many as five and as few as one outside contractors, and normally has engaged two or three such contractors at a given time.

26. In 1968 and a substantial portion of 1969, perhaps to date, Tafgo has been one of no more than three major outside contractors providing plaintiff with a completely finished Ban-Lon knitted sweatershirt, requiring no further dying or finishing by plaintiff, as was required of goods supplied by other outside contractors.

27. During the year 1968, plaintiff's wholesale sales to retailers of that style designated as "Brookfair" substantially increased, more than doubling plaintiff's sales during 1967. (Pl. Exs. Y–101–04)

28. There is substantial evidence that when there was an increased demand by retailers for plaintiff's sportswear, including knitted sweatershirts, plaintiff relaxed the quality control standards which it imposed at the time of inspecting both garments of its own manufacture and garments manufactured for it by outside contractors and that plaintiff sold at wholesale to retailers serviced by plaintiff's own marketing division garments under the "Puritan" name which exceeded the tolerances permitted by plaintiff's own quality control specification sheets (R. 1090–1093, 1131–1210)

29. Between December 2, 1968 and June 4, 1969, plaintiff returned to Tafgo, as failing to meet plaintiff's quality control inspection, a substantial number of entire garment-lots originally manufactured by Tafgo for plaintiff.

30. Said garment-lots returned by plaintiff to Tafgo were comprised, in total, of approximately 2300 dozen sweatershirts, including approximately 1300 dozen Brookfairs returned between December 2, 1968 and December 19, 1968 for the particular reason of incorrect sizing and approximately 1000 dozen Brookfairs, Brookviews and Brooktons returned thereafter for reasons of appearance as well as incorrect sizing. (Pl. Exs. Y–1 through Y–23b)

31. Said garment-lots were rejected by plaintiff following a quality inspection which was summary in nature and not established to be statistically valid, wherein three per cent of the individual garments in any given garment-lot, not chosen at random, were examined by plaintiff. (R. 1244)

32. While it was understood by Sigo and/or Tafgo in late 1967 and early 1968 that Tafgo was to manufacture to plaintiff's specifications, and while there is some evidence that manufacturers for plaintiff generally are provided with specification sheets and measuring point diagrams setting forth the sizes and tolerances and methods of measuring various styles of plaintiff's sweatershirts, there is no substantial evidence that Tafgo was provided at that time or thereafter with the particular specification sheets and measuring point diagrams setting forth the sizes and tolerances and methods of measuring various styles of plaintiff's sweatershirts which plaintiff itself used in its quality control department at the various times when the garments manufactured by Tafgo and shipped to plaintiff were inspected by plaintiff. (Deft. Exs. 20, 21, 50, 51 and R. 1037–40, 1093–1101, 1214–16)

33. There is substantial evidence to support the fact that plaintiff's styles of knitted Ban-Lon shirts and in particular styles known as Brookfair and Brookview were changed from time to time during plaintiff's relationship with Sigo

and Tafgo, and that a change in style did on occasion result in a change of measuring point diagrams. There is no substantial evidence as to if and when plaintiff ever supplied Tafgo with new measuring point diagrams or new specification sheets apprising Tafgo of a change made in any given style which would effect a change in the sizes of the garments to be manufactured by Tafgo or a change in the manner by which Tafgo would measure test garments before manufacture. (Deft. Exs. 20, 21, 50, 51 and R. 1037–40, 1093–1101, 1214–16)

34. With respect to the entire 1300 dozen or so Brookfairs returned by plaintiff to Tafgo between December 2, 1968 and December 19, 1968 and certain Brookfairs returned thereafter, plaintiff credited itself with its purchase price from Tafgo upon return to Tafgo.

35. During the year 1969, plaintiff's wholesale sales to retailers of the style Brookfair have substantially declined from the year 1968, and 1969 sales are projected to be 30% less than 1968 sales in said style. (Pl. Ex. Y–101–4)

36. Although the Court does not rely in substantial part upon it, an inference can be drawn that plaintiff, through its admittedly close contact with the retailers to whom it sold, was able in December 1968 to anticipate the coming year's decline of Brookfair sales and, in response thereto, unilaterally tightened its quality control inspection at that time, so as to look upon garments shipped to plaintiff by Tafgo with a "more discriminating eye".

37. The aforementioned approximate 1300 dozen Brookfair garments returned to Tafgo were all returned upon invoices containing the statement "to be downsized". (Pl. Exs. Y–1 through Y–14)

38. The invoice statement "to be downsized" was not equivalent to a directive to Tafgo to repair and return to plaintiff the Brookfairs sent back to Tafgo under such an invoice because plaintiff, when it chose to issue a directive to "repair and return", used that literal language in connection with the rejection of other garments to Tafgo. (Pl. Exs. Y–15, Y–17, Y–18, Y–19, Y–20, Y–21)

39. The statement "to be downsized" meant nothing more and nothing less than that, in plaintiff's view, the garments were too short or too narrow or too short and too narrow to meet plaintiff's quality control requirements for a garment designated a particular size such as medium.

40. Plaintiff's own executives impliedly acknowledged that the statement "to be downsized" was not equivalent to a directive to repair and return. It was impliedly acknowledged that if a garment was too short and/or too narrow to meet Puritan's technical specifications and tolerances for a medium upon examination and measurement of each individual garment by Tafgo, those garments which failed to meet the technical specifications of a medium might also fail to meet the technical specifications of a small, the next lesser size, and could not be "repaired" by placing the next smaller size label upon them. (R. 131, 1004)

41. Plaintiff's statement "to be downsized", even if interpreted as a statement that Tafgo was obligated to repair and return those Brookfairs upon which the next lesser size label could be placed by Tafgo, would be directly contradictory to the understanding reached and reduced to writing in plaintiff's letter dated February 5, 1968, whereby Tafgo had no obligation to repair and return garments returned to them as second quality but rather had the unfettered right to dispose of them in commerce. (Deft. Ex. 3)

42. Without new legal consideration running to Tafgo, and no evidence of the same appears, plaintiff could not unilaterally create a legal obligation upon Tafgo to repair and return any rejected garment-lots or individual garments contained therein which had been ordered by plaintiff prior to the issuance of such a directive upon the prior understanding

that Tafgo had no obligation to repair and return.

43. Plaintiff returned to Tafgo the aforesaid 1300 dozen or so Brookfairs in the completely finished, bagged, tagged and labeled form in which they were received from Tafgo, removing on return neither the genuine "Puritan" labels and tags nor the other "fittings"—the bags, pins and tissues in which the garments were packaged.

44. Plaintiff had its own facilities for removing labels and tags from garments which plaintiff itself chose to sell as second quality, whether said garments originated from its own manufacture or from that of an outside contractor, but did not utilize such facilities to remove labels and tags from the garments contained in the garment-lots returned to Tafgo.

45. On January 28, 1969, over a month after plaintiff returned to Tafgo the approximate 1300 dozen Brookfairs under invoices stating "to be downsized", Jay Strawmire, Assistant Knitwear Merchandising Manager of plaintiff, sent a letter to Ivan Gordon, Vice President of Tafgo, observing that garments had been returned to Tafgo which "may" have had incorrect sizing and that plaintiff would accept no "reprocessing merchandise" unless shipped within four weeks' time. (Deft. Ex. 4)

46. By "reprocessing merchandise" it may be inferred from the testimony that plaintiff was referring to any garments, whether repaired or newly manufactured by Tafgo, which Tafgo might ship to plaintiff in replacement of the original rejected shipments of Brookfairs and in order to reverse credits to plaintiff on the original orders placed by plaintiff. (R. 1004)

47. By the letter of January 28, 1969, plaintiff sought to impose a four-week time requirement on garments already ordered but rejected by plaintiff even though plaintiff, during the course of 1968, established a precedent of accepting merchandise beyond any delivery date stated on original orders. (Deft. Exs. 4 and 14)

48. There is no evidence that plaintiff, from the time the Brookfairs were returned as incorrectly sized to the time of suit, ever made inquiry as to whether Tafgo intended to ship to plaintiff garment-lots on the original orders for the rejected Brookfairs.

49. In the latter part of March, 1969, plaintiff advised Tafgo that although it had established a precedent of accepting delivery from Tafgo beyond the delivery date stated on its orders during the prior business relationship with Tafgo, it would no longer accept late delivery. (Deft. Ex. 14)

50. An inference may be and is so drawn that as the demand for plaintiff's style Brookfair declined, plaintiff, apart from any right to have rejected Brookfairs repaired and returned by Tafgo, in fact had no desire that said garments be returned to it.

51. Between June 19 and July 10, 1969, Tafgo sold to one Perry Marziale, (hereinafter called Marziale) a resident of Fairbank, Pennsylvania, 449½ dozen sweatershirts comprised of 397½ dozen styled Brookfair and 52 dozen styled Brookview.

52. Marziale, as an individual, is and has been engaged for a number of years in the business of purchasing garments from various garment manufacturers and reselling them in commerce. (R. 550–52)

53. In addition, Marziale was and may still be an executive officer of Fairbank Knitting Mill, a garment manufacturer which from 1959 to April of 1969 was engaged in the manufacture of garments and from 1965 or 1966 until some time early in 1969 manufactured garments for plaintiff. Marziale also is the sole proprietor of Marziale Heating Company, a plumbing and heating business operated by him since about 1939.

54. The sweatershirts purchased by Marziale from Tafgo were billed to Mar-

ziale Heating Company but understood to be purchased by him as an individual.

55. All of the 449½ dozen sweatershirts sold to Marziale by Tafgo were garments which had been part of garment-lots originally shipped from Tafgo to plaintiff but rejected by plaintiff and returned to Tafgo.

56. None of the 449½ dozen sweatershirts sold to Marziale by Tafgo were garments returned by plaintiff to Tafgo with directions to be repaired and returned to plaintiff. (Gordon Dep. 39)

57. Said garments were sold by Tafgo to Marziale in the same condition as they were originally shipped by Tafgo to plaintiff and subsequently returned by plaintiff to Tafgo, i. e. in a completed package containing pins, tissue, bags and "Puritan" labels and tags, all originally supplied by plaintiff.

58. Tafgo is engaged in a trade comprised of garment manufacturers who, as contractors, manufacture garments for other clothiers, as customers, who sell the garments in commerce under the customer's own tradename and/or trademark.

59. Ivan Gordon, Vice President of Tafgo, testified that, absent a contractual agreement to the contrary, the custom in the aforesaid trade is for contractors to sell in commerce "as is" and without the removal of the customer's labels, tags or bags, any garments which a customer rejects and returns to said contractor without removing labels, tags or bags containing the customer's tradename on them. (Gordon Dep. 39–40)

60. Plaintiff is engaged in a trade comprised of clothiers who sell garments in commerce under their own tradenames and/or trademarks which garments are manufactured by the clothier itself and/or by outside contractors. Witnesses for plaintiff testified that the custom of clothiers in plaintiff's trade is to remove its own tradename and/or trademark from any garments which it regards as second quality and chooses to sell as such, as plaintiff is wont to do, in commerce.

61. There is a sharp conflict as to the existence of any well established, general, and uniform custom with regard to the specific conduct herein. Neither party has met the requirements of law as to the establishment of a custom and the matter therefore must remain for determination upon final hearing when each of the parties will have had the opportunity to complete discovery and will be in a position to offer any and all evidence that might be found in support of their respective contentions.

62. To remove the Puritan labels, tags and bags from the garments sold to Marziale by Tafgo would have caused a substantial additional expense to Tafgo which it was not obligated to incur and would have reduced the market value of the garments upon sale by Tafgo in commerce, further increasing Tafgo's loss upon the manufacture of the garments.

63. The 449½ dozen sweatershirts sold to Marziale by Tafgo were sold on the contractual terms "as is" and prior to sale Tafgo advised Marziale that said sweatershirts were manufactured for plaintiff but rejected by it. (Gordon Dep. 21–24, 15–17)

64. Between July 2 and July 17, 1969, Marziale sold and delivered to defendants 397½ dozen Brookfair sweatershirts and 48 dozen Brookview sweatershirts, or a total of 445½ dozen.

65. Defendant Herbert J. Shure was engaged in the business of buying clothing merchandise and selling it at wholesale as a sole proprietor of H&M Distributing from 1956 until June 4, 1969 or thereabout when he caused to be incorporated defendant H&M Distributing, Inc., a Pennsylvania corporation, which has engaged since incorporation in the same business.

66. Defendant Shure had known of Marziale for several years and had business dealings with him prior to the aforementioned transaction. (R. 399)

67. Marziale transacted the sale of the first lot of sweatershirts by delivering them to defendant Shure and show-

ing a sample to him; Marziale did not state from whence he had obtained the sweatershirts, and the question was not asked of him by defendant Shure. (R. 399–401)

68. There is no evidence that defendants acted in bad faith or improperly in purchasing for value Brookfair and Brookview style knit sweatershirts from Perry Marziale, Uniontown, Pennsylvania, a merchant who regularly dealt in men's sportswear and other types of garment merchandise.

69. There is no evidence that defendants knew or had reason to know that Marziale lacked the right or the authority to sell Brookfair and Brookview style knit sweatershirts.

70. There is no evidence that defendants knew or had reason to know that anyone needed plaintiff's authorization to sell Brookfair and Brookview style knit sweatershirts.

71. There is no evidence that defendants knew or had reason to know of the method by which plaintiff sold and distributed its Brookfair and Brookview style knit sweatershirts.

72. Between July 2, 1969 and August 8, 1969 (after which defendant Shure consented to and abided by a temporary restraining order of this Court), defendants sold to more than twenty-five retail stores in nine different states all but approximately 100 dozen of the Brookfair and Brookview shirts sold to him by Marziale including 328⁹⁄₁₂ dozen of the style Brookfair.

73. None of the aforementioned Brookfairs or Brookviews, including those sold to the retail trade by defendants, were altered, refurbished, repaired or refinished by Tafgo, Marziale or defendants.

74. All of the Brookviews and Brookfairs sold by defendants to aforementioned retail stores were sold at wholesale prices which were and are less than the price at which plaintiff sells said styles to the retail trade through its own marketing division.

75. Although the Brookfair and Brookview sweatershirts purchased and sold by defendants originally had been rejected by plaintiff as failing to meet plaintiff's specifications and tolerances, an in-court examination by plaintiff's Assistant Knitwear Merchandising Manager of twenty-two Brookfairs and Brookviews sold as first quality goods by plaintiff itself to well established retail stores in Pittsburgh, Pennsylvania, (and which passed plaintiff's quality control) revealed that substantially all of said twenty-two garments fail to meet the very quality and size specifications and are outside the very tolerances which plaintiff claimed to be the basis for rejection of the Brookfairs and Brookviews returned to Tafgo and ultimately sold by defendants. (R. 1131–1210 and Deft. Exs. 23–43)

76. A similar examination by plaintiff of nine Brookfairs and Brookviews purchased by defendants from Marziale demonstrated that said garments are also outside plaintiff's specifications and tolerances as presented in Court by plaintiff. (R. 1026–1065, Pl. Exs. D–M except K and T)

77. The sample of Brookfairs and Brookviews which were purchased by defendants from Marziale and the sample of Brookfairs and Brookviews which were sold directly by plaintiff to the retail trade as first quality were equally representative of all Brookfairs and Brookviews purchased by defendants from Marziale and of all Brookfairs and Brookviews sold by plaintiff to the retail trade, and there is no substantial difference in the quality of the same.

78. The Brookfairs and Brookviews purchased by defendants from Marziale, including those already sold by defendants to the retail trade, meet the standards of "Puritan" Brookfairs and Brookviews sold as first quality by plaintiff through its own marketing division to the retail trade and ultimately resold to the consumer under the "Puritan" label.

79. There is no substantial evidence that any consumers purchasing at retail or any retail stores which have purchased any of the aforementioned "Puritan" Brookfairs or Brookviews sold to the retail trade by defendants have complained of the quality of the garments purchased by them.

*Misuse, Unclean Hands, and Antitrust Defenses*

80. Plaintiff sells to the retail trade approximately forty per cent of all full-fashioned knitted Ban-Lon sweatershirts marketed at a retail price of ten dollars or above. (R. 903-4)

81. From the evidence educed thus far, it cannot be ascertained whether or not the market for Ban-Lon sweatershirts sold at a retail price of ten dollars or above constitutes a market or submarket of legal relevance under the antitrust laws. (R. 903-4)

82. It is an admitted policy of plaintiff not to sell to discount stores. (R. 220, 718, 813-16, 823-832)

83. There is, in addition, substantial evidence that plaintiff has established a policy of refusing to deal with any retailers who refuse or fail to sell plaintiff's merchandise at plaintiff's pre-ticketed retail price. (R. 220, 718, 813-16, 823-832)

84. There is substantial evidence that plaintiff has a policy under which its salesmen and independent investigators and/or detectives watch for and report to plaintiff an "off price" retail sale of plaintiff's merchandise. (R. 712-17, 722-23, 829-30, 922-24, 1370-91)

85. There is substantial evidence that plaintiff has a policy of calling retailers to whom it has sold and who are selling plaintiff's garments below the pre-ticketed price in order to find out "what is going wrong". (R. 829)

86. While there is substantial evidence that plaintiff has experienced thefts of sizeable numbers of plaintiff's garments and that an unusually low retail price may suggest the receipt of stolen garments, plaintiff, on a given occasion investigated an individual reported to plaintiff to be selling plaintiff's garments at low retail prices, but who, in fact, had legitimately obtained said garments by purchasing them from a retailer to whom plaintiff had originally sold the garments. (R. 1370-89)

87. In the aforementioned instance, plaintiff's investigation extended to and/or became known to the retailer who sold plaintiff's garments to the aforementioned individual with the effect that said retailer was discouraged from making other sales of plaintiff's garments to persons who might resell them. (R. 1370-89)

88. During the week of July 14, 1969, a buyer for a May Company department store located in Cleveland, Ohio, reported to plaintiff that a person had offered to sell said department store at "off price" wholesale prices a continuing supply of plaintiff's merchandise. In response, Lawrence S. Bloom, Vice President of Merchandising of plaintiff called the buyer from the May Company and in response to his inquiry was advised that the aforementioned person was defendant Shure of defendant H&M Distributing, Washington, Pennsylvania. (Bloom Affidavit)

89. Without knowing anything about the source of the "Puritan" garments in the possession of defendants but having been provided with defendants' name and location, Mr. Bloom proceeded to request both said buyer of the Cleveland May Company and the Vice President thereof to purchase the goods offered by defendant so that plaintiff could investigate further. This request was refused. (Bloom Affidavit)

90. On August 1, 1969, a salesman of plaintiff operating in a territory including the West Virginia area entered the L. S. Good & Company Department Store in Wheeling, observed a substantial number of plaintiff's knitted Ban-Lon sweatershirts being sold on sale at less than plaintiff's pre-ticketed price, inquired of an L. S. Good buyer as to where the goods had been obtained and at what price and was advised by said buyer that the gar-

ments had been purchased by the owner of the store. Plaintiff's West Virginia salesman reported the same to Mr. Bloom. (Bloom Affidavit)

91. Mr. Bloom in turn reported the same to Mr. Frank Ayers, personnel director of plaintiff, who, on the same date, directed one Mr. Frank Ellis, co-owner of the detective agency Investigation and Protective Services, Inc., to investigate at L. S. Good & Company for the reason that garments were being sold there at surprisingly low prices. (Ellis Affidavit)

92. On August 4, 1969, Mr. Ellis went to L. S. Good & Company, identified himself to a clerk as being from Puritan Sportswear Corporation, and requested to see the buyer, who was not then available. While awaiting the arrival of the buyer, Mr. Ellis purchased seven "Puritan" Ban-Lon sweatershirts at off-prices, went to a telephone and reported the prices to Mr. Ayers. He then returned, met the L. S. Good & Company buyer and after a half hour was referred to Mr. Good who advised Mr. Ellis that the garments had been purchasd from defendants, that Mr. Good did not want to get into any trouble and that he would ship the garments elsewhere. (R. 1390–1427)

93. August 5, 1969, Mr. Ellis, at the direction of plaintiff, went to defendants' establishment whereupon defendant Shure refused to disclose the source of the sweatershirts obtained by him.

94. Following the visit to defendants' place of business, Mr. Ellis and Mr. Walker, a personnel supervisor of plaintiff, walked within the downtown area of Washington, Pennsylvania, searching for stores which might be selling merchandise under plaintiff's label at below the pre-ticketed price. (R. 1501–14)

95. Mr. Ellis and Mr. Walker came upon a retail store in Washington, Pennsylvania, to which plantiff sold a line of plaintiff's garments, indicated that they were investigating a possible theft of plaintiff's merchandise, inquired of defendants' background there, and advised an employee or owner of said store that another retail store in Washington, Pennsylvania, was selling garments under the plaintiff's label at off-prices. (R. 1501–14)

96. The employee and/or owner of retail store visited indicated his displeasure at the off-sale prices of the other retail store and, upon the request of Mr. Ellis, agreed to purchase garments from defendants. Said employee and/or owner sent an unidentified person to make said purchase but defendants did not sell to said individual. (R. 1501–14)

97. Plaintiff instituted this trademark infringement suit against defendants on August 12, 1969, without knowing from whence defendant had obtained plaintiff's garments and knowing only that the garments had the appearance of genuine first quality "Puritan" garments and that plaintiff's own records did not indicate a direct sale by plaintiff to defendants. The initial objective of the suit was to determine the nature and source of the goods in the possession of defendants. (Bloom Affidavit, R. 5)

98. On September 2, 1969, plaintiff, having deposed defendant Shure, then deposed Marziale for purposes of this suit and upon said deposition first learned that Marziale had purchased from Tafgo the garments sold to defendants by Marziale.

99. Subsequent to September 2, 1969, plaintiff directed Mr. Ellis to make purchases of "Puritan" garments at three Glosser Brothers Department Stores located in Johnstown, Monroeville, and Greensburg, Pennsylvania, for the purpose of determining the nature of the garments and the price at which they were being sold. (R. 1593–96)

100. On September 12, 1969, plaintiff sent a telegram to Glosser Brothers Department Stores advising that in the aforementioned three locations, Glosser Brothers was selling "unauthorized" Puritan merchandise and advising that a trademark suit would be instituted

against it if the sale of merchandise bearing the "Puritan" label continued. (Deft. Ex. 13)

101. Since September 2, 1969, when plaintiff learned that sweatershirts returned to Tafgo had been sold bearing the "Puritan" name, until the present, plaintiff has taken no legal action against Tafgo and/or Sigo. (R. 144, 801–4)

102. As late as October 27, 1969, plaintiff still had not claimed any breach of contract or infringement of trademark by Tafgo and/or Sigo as a result of Tafgo's sale of Brookfair or Brookview sweatershirts to Marziale. (Pl. Ex. S–11)

## CONCLUSIONS OF LAW

### Jurisdiction

1. The Court has jurisdiction over the parties to this action and the subject matter thereof.

### Validity of Trademark and Protection Afforded Thereby

2. Plaintiff is the owner of three validly registered trademarks, two of which contain the word "Puritan" as a dominant and distinctive part of the mark and one of which is solely comprised of that mark. 15 U.S.C. § 1115, 15 U.S.C. § 1056.

3. At all times relevant hereto, plaintiff has had the right, under one or more of the aforementioned registered trademarks, to use the word "Puritan" in commerce in connection with certain men's clothing known commonly as sportswear, including full fashioned knit Ban-Lon sweatershirts, and said right of use was and is exclusive within the limited meaning of the Lanham Act. 15 U.S.C. § 1115.

4. Plaintiff's registration of the trademark "Puritan Sportswear, the Choice of All Americans" has entitled and does entitle plaintiff to the protection of the Lanham Act in connection with its modified use of that trademark wherein plaintiff has eliminated all words but the word "Puritan", and said modified use constitutes no intentional abandonment of the original trademark. 15 U.S.C. § 1127, Proxite Products, Inc. v. Bonnie Brite Products Corp., 206 F.Supp. 511 (S.D.N.Y.1962)

### Infringement and Defenses Thereto

5. In selling to the retail trade genuine first quality garments of plaintiff containing genuine "Puritan" labels and representing them as such, defendants have not infringed plaintiff's trademarks. Independent News Co. v. Williams, 293 F.2d 510, 515; (3d Cir. 1961), Burlington Mills Corporation v. Roy Fabrics, 91 F.Supp. 39, 47 (S.D.N.Y. 1950), aff'd 182 F.2d 1020 (2d Cir. 1950)

6. Defendants have neither altered nor reconditioned plaintiff's garments nor did said garments require the same, being of first quality. See Burlington Mills Corporation v. Roy Fabrics, *supra*.

7. The doctrine of estoppel is properly invoked against one who, having spoken or acted one way under one set of circumstances and with one objective in mind, undertakes under other circumstances and when the objective has changed, to testimonially give a different color to what they formerly said and did. Holly Hill Citrus Growers' Ass'n v. Holly Hill Fruit Prod., 75 F.2d 13, 17 (C.C.A. 5th, 1935)

8. Plaintiff cannot be heard to say that the garments sold by defendants are less than plaintiff's first quality on the ground that they failed to meet technical specifications where the garments sold by defendants are of substantially the same quality as garments sold by plaintiff to the retail trade and ultimately to the public, which garments sold by plaintiff are also in excess of plaintiff's technical specifications. See Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, 268 F.2d 569 (3d Cir. 1959) and Independent News Co. v. Williams, *supra*.

9. Plaintiff cannot be heard to say either that the garments sold by defendants do not come from the same source as plaintiff's garments or that the gar-

ments are not of its own manufacture. Plaintiff had said garments and others manufactured for it by Tafgo, had established a precedent of relaxing its quality control standards and accepting garments outside technical specifications during a period of high demand for said garments, which period was concurrent with the onset of plaintiff's business relationship with Tafgo, and then unilaterally tightened its quality control standards and enforced technical specifications as a justification for rejection of garments manufactured to prior order. See Joseph Bancroft & Sons Co., *supra*.

10. Plaintiff itself launched in commerce in a completely finished and packaged form and containing genuine "Puritan" labels the garments purchased and presently possessed or sold by defendants.

■ 11. Under its agreement with plaintiff, Tafgo was authorized to sell in commerce all garments manufactured by Tafgo and rejected by plaintiff. Having rejected and returned to Tafgo the garments in question with genuine labels upon them where plaintiff had facilities customarily used to remove said labels, plaintiff cannot be heard to say, at least against these defendants, that defendants' use of the garments with attached labels was unauthorized.

12. In equity, plaintiff's conduct above, and its notable failure to specify in a formal contract with Tafgo or otherwise to advise Tafgo, either orally or in writing, that plaintiff wished to limit Tafgo's authority to sell in commerce rejected garments containing plaintiff's identification, must be weighed against the substantial good faith of the defendants herein.

13. Defendants have, in no manner, deceived the public or made misrepresentations to it with respect to either the quality or origin of the garments sold by them, nor has any confusion been created in the mind of the public with regard thereto.

### Misuse, Unclean Hands and Antitrust Defenses

■ 14. In affording protection against the infringement of a trademark, the Lanham Act has as its fundamental purpose the avoidance of public confusion as to the origin of goods—it neither authorizes restraints of trade nor affords protection of an exclusive right to market trademarked goods. Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena, 298 F.Supp. 1309, 1314 (S.D.N.Y.1969); Developments in the Law of Trade-marks and Unfair Competition, 68 Harv.L.Rev. 816, 852 (1955)

■ 15. A claim of trademark infringement must be carefully scrutinized to ensure that trademarks and the threat of trademark litigation is not, in essence, used in restraint of trade. Clairol Inc. v. Gillette Co., 270 F.Supp. 371 (E.D.N.Y. 1967)

16. Plaintiff maintains virtually exclusive control of the marketing of its goods at wholesale, and there is substantial evidence that said marketing is conducted under a policy of at least unilateral resale price maintenance.

17. Plaintiff's conduct in investigating defendants through extensive inquiries to the retail trade, its exercised choice to pursue suit for trademark infringement against these defendants and to threaten to so sue a retailer having purchased from defendants, all of whom are not manufacturers of garments but rather remote sellers in the distributive chain of commerce, and plaintiff's conspicuous failure to sue its own manufacturer for infringement of trademark or breach of contract, considered together, evidence more than a passing concern for the protection of an exclusive right to market plaintiff's goods in commerce at wholesale and also, in all likelihood, for the price at which said goods are sold, both at wholesale and retail.

■ 18. To the extent that plaintiff seeks by this action to protect the integrity of an exclusive wholesale marketing

arrangement rather than the integrity of its trademark, it is sufficient to say that the Lanham Act affords no such protection and that a court of equity will not lend itself to this purpose in a trademark infringement action. Whether plaintiff's conduct and objectives taint plaintiff with unclean hands or misuse of trademark need not be determined, for relief is being denied on other grounds.

19. With respect to the defense founded upon alleged violation of the Sherman and Clayton Acts, defendants have offered pertinent evidence in support of the premise that plaintiff has, in combination with others or by implied coercion, maintained resale prices and/or caused others to refuse to deal with defendants. Because relief is being denied on other grounds, I do not need to decide factual and legal issues posed, including the extent to which plaintiff's trademark has been a vehicle for the alleged antitrust violations. This in no way affects defendants' opportunity to pursue its counterclaim and to engage in further discovery in order to develop all facts relevant thereto.

*Injunctive Relief*

20. A preliminary injunction is an extraordinary remedy and only may be granted upon a substantial showing by plaintiff that it is entitled to the drastic relief requested. Plaintiff must show, not alternatively but conjunctively, three things: first, that plaintiff will suffer immediate irreparable injury if the preliminary injunction is not granted; second, that balancing the conveniences and possible injuries to both parties, the scales of equity weigh in favor of plaintiff, and third, that plaintiff is reasonably likely to succeed in establishing his case on the merits in a full hearing for final injunctive relief. I. T. S. Industria Tessuti Speciali v. Aerfab Corp., 280 F.Supp. 581, 585 (S.D.N.Y. 1967)

21. Plaintiff will suffer no irreparable injury to its trademark or to the fine reputation of the garments sold under that trademark by virtue of defendants' sale of "Puritan" garments of the same quality as those sold directly to the retail trade by plaintiff. Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, 268 F.2d 569, 575–576 (3d Cir. 1959) reversing 175 F.Supp. 107 (E.D. Pa.1958)

22. Balancing the conveniences and possible injuries to the parties, I find that to enter an injunction against defendants, comparatively small business enterprises, would cause them financial loss and injury to their good business reputation far outweighing any damage which might be suffered by plaintiff as a result of defendants' sale of what is a rather small percentage of plaintiff's garments. See Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, *supra*.

23. In this unduly prolonged hearing upon a request for preliminary injunction, plaintiff has failed to demonstrate that there is a likelihood of its success upon a hearing for final injunctive relief.

24. Injunctive relief should not be granted against these defendants who have purchased in commerce garments of plaintiff originating with plaintiff's own manufacturer where plaintiff can more effectively police its own manufacturer in the future by appropriate formal contractual provisions, by notifying the retail trade of the provisions and the garments to which they apply, and by exercising greater control over the use of the labels, tags and bags bearing the "Puritan" mark. Independent News Co. v. Williams, 273 F.Supp. 375, 376 (E.D.Pa.1967)

Consistent with the findings and conclusions herein expressed, an appropriate Order is entered.