CHIPS 'N TWIGS, INC., Plaintiff,

v.

CHIP–CHIP, LTD., Defendant.

Civ. A. No. 75–3295.

United States District Court,
E. D. Pennsylvania,
Civil Division.

May 19, 1976.

Ronald L. Panitch, Roberta Jacobs, Philadelphia, Pa., for plaintiff.

Jesse Rothstein, New York City, James A. Young, Philadelphia, Pa., for defendant.

## OPINION

DITTER, District Judge.

Plaintiff, Chips 'N Twigs, Inc., instituted this suit against defendant Chip-Chip, Ltd., charging the latter with statutory trademark infringement and false designation of origin of goods in violation of sections 32(1) and 43(a) of the Lanham Act, 15 U.S.C. §§ 1114(1) and 1125(a), and common law unfair competition. Presently before the court is the plaintiff's motion for a preliminary injunction.[1] After careful consideration of the briefs and affidavits of the parties and the evidence adduced at the hearing, I make the following:

## FINDINGS OF FACT

1. Plaintiff, Chips 'N Twigs, Inc., (hereafter "Chips") is a Pennsylvania corporation having a principal place of business at

1. Plaintiff's complaint also seeks permanent injunctive relief, an order directing the defendants to deliver up for destruction all items bearing the allegedly infringing marks, an accounting of profits realized by the defendant from use of the allegedly infringing marks, and treble damages. Defendant has filed a counterclaim alleging violation of the anti-trust laws and seeking injunctive relief and treble damages. None of these matters are before me at this juncture.

Broad and Wallace Streets, Philadelphia, Pennsylvania 19130.

2. Defendant, Chip-Chip, Ltd., (hereafter "Chip-Chip") is a New York corporation having a principal place of business at 1441 Broadway, New York, New York 10018.

3. In 1916, Chips' predecessor in title, B. Schwartz & Co., commenced operations as a manufacturer of juvenile clothing. In 1951 B. Schwartz & Co. merged with Wm. Schwartz & Co., Inc., a corporation which had been organized in 1946. On May 7, 1956, by appropriate corporate action and statutory procedures Wm. Schwartz & Co., Inc., became Chips 'N Twigs, Inc. Chips 'N Twigs, Inc., is known in the trade as "Chips."

4. On July 20, 1944, Chips' predecessor B. Schwartz & Co., adopted the trademark "CHIPS OFF THE OLD BLOCK," and on March 13, 1945, received Registration No. 412,572 for the application of this mark to juvenile and boys' suits, sport coats and outer wearing apparel. This registration was republished under section 12(c) of the Lanham Act, 15 U.S.C. § 1062, on July 22, 1952, by Wm. Schwartz & Co., Inc., and became incontestable on May 19, 1958, when affidavits were filed and accepted pursuant to sections 8 and 15 of the Act, 15 U.S.C. §§ 1058, 1065. Registration No. 412,572 was assigned to Chips and was renewed for 20 years under section 9 of the Act, 15 U.S.C. § 1059, on March 13, 1965.

5. On July 20, 1944, B. Schwartz & Co. adopted the trademark "CHIPS." The United States Patent Office issued Registration No. 414,492 to B. Schwartz & Co. on June 12, 1945, for this trademark for juvenile and boys' suits, sport coats and outer wearing apparel. This registration was republished under section 12(c) of the Act on July 1, 1952, by Wm. Schwartz & Co., Inc., becoming incontestable on May 19, 1958, when affidavits were filed and accepted pursuant to sections 8 and 15 of the Act. Registration No. 414,492 was assigned to Chips and was renewed for 20 years under section 9 of the Act on June 12, 1965.

6. On October 5, 1955, Wm. Schwartz & Co., Inc., adopted the trademark "MR. CHIPS." The Patent Office issued Registration No. 637,481 on November 20, 1956, for this trademark for men's and boys' suits, jackets, coats, sport coats, topcoats, overcoats, snowsuits, pants, shorts, swimsuits, robes, beachwear and shirts. This registration became incontestable on May 17, 1962, when affidavits were filed and accepted pursuant to sections 8 and 15 of the Act. Registration No. 637,481 has also been assigned to Chips.

7. On August 1, 1955, Wm. Schwartz & Co., Inc., adopted the trademark "CHIPS 'N TWIGS." The Patent Office issued Registration No. 652,100 to plaintiff on September 24, 1957, for this trademark for young men's, boys' and children's suits, jackets, coats, sportcoats, topcoats, overcoats, snowsuits, pants, shorts, swimsuits, robes, beachwear and shirts. The registration became incontestable on August 6, 1963, when affidavits were filed and accepted pursuant to sections 8 and 15 of the Act.

8. On November 15, 1966, Chips adopted the trademark "BLUE CHIP." The Patent Office issued Registration No. 836,788 to plaintiff on October 10, 1967, for this trademark for men's and boys' suits, jackets, coats, sportcoats, topcoats, overcoats, pants, shorts, shirts, hats, and beachwear. This registration became incontestable when affidavits were filed and accepted pursuant to sections 8 and 15 of the Act.

9. Prior to November 1971, Chips adopted the trademark "CHIP KNITS" for young men's clothing made of knit fabric.

10. The registered trademarks "CHIPS OFF THE OLD BLOCK," "CHIPS," "MR. CHIPS," "CHIPS 'N TWIGS," and "BLUE CHIPS" and the unregistered trademark "CHIP KNITS" constitute the plaintiff's "CHIPS" family of trademarks.

11. Chips' trademarks have been used in commerce for suits, sportcoats, blazers, leisure suits, slacks, leatherware, overcoats, outerwear, and rainwear from the time of their adoption through the present time. However, there was no evidence that the "CHIPS" family of trademarks have been used in commerce for shorts, swimsuits, robes, beachwear, shirts or hats.

12. Chips has a conservative policy with respect to trademarks and has adopted no new marks since 1971. While the styles of wearing apparel sold by plaintiff have changed over the years, its trademarks have remained the same.

13. Most of plaintiff's labels and advertisements bear the "CHIPS" family of trademarks in a vine and woodsmen motif and some depict the figure of a man chopping wood. However, there are some other labels and advertisements that feature these marks in ordinary print or block lettering. The dominant portion of each of plaintiff's trademarks is the name it carries and the dominant portion of most of these names is the word "CHIP."

14. The apparel manufactured by Chips under its trademarks is intended for boys between the approximate ages of 6 to 16 who wear sizes 8 to 20. Chips' garments are purchased both by these young people themselves and on their behalf by adults.

15. The apparel manufactured by Chips is not intended for, but is in fact worn by slim or small men.

16. Chips manufactures and sells wearing apparel for young men in sizes 36–44 under the trademark "ACADEMY CLOTHES." The labels on these garments do not contain any of plaintiff's "CHIPS" family of trademarks or plaintiff's trade name, "CHIPS 'N TWIGS, INC." However, plaintiff does advertise its Academy line of clothing simultaneously with clothing sold under its "CHIPS" family of trademarks and in conjunction with its trade name, "CHIPS 'N TWIGS, INC."

17. The term "junior" is often used in connection with wearing apparel for boys to indicate the smaller size range. Plaintiff manufactures and sells, *inter alia,* boys' junior sportswear.

18. Chips has used its trademark since 1944 to identify its products and to distinguish them from those made and sold by others.

19. Plaintiff has engaged in extensive advertising of its "CHIPS" garments, during the past five years spending more than $200,000. to promote this family of trademarks.

20. Plaintiff has advertised its "CHIPS" trademarked goods to the public in the *New York Times Magazine, Mens Wear Magazine,* and newspapers throughout the country.

21. Gilbert Saft, Chips' executive vice president, has appeared on televised fashion shows sponsored by plaintiff in major cities throughout the country. These fashion shows featured clothes manufactured by Chips and sold by local department stores in the area of the telecasts.

22. As part of an advertising campaign, an ad promoting plaintiff's "CHIPS" trademarked goods appeared in every Playbill for every Broadway and "off-Broadway" theatre in New York City during the month of March, 1973.

23. In connection with its motion picture, *Goodby, Mr. Chips* starring Pete O'Toole, MGM productions approached plaintiff and Hystron Fibers about engaging in a joint advertising campaign that would promote the movie and Hystron's fiber "Trevira" as used in Chips' clothing. Chips and Hystron accepted the proposal. As part of this campaign, Gimbels placed a double-page ad in a New York newspaper featuring O'Toole with a group of boys dressed in plaintiff's clothing. Gimbels also devoted two display windows at its New York store to advertising the movie and the clothing. Similar promotional activities were carried out by other stores throughout the country.

24. Plaintiff also has engaged in extensive advertising of its "CHIPS" family of trademarks to the trade.

25. For at least the past ten years, plaintiff has reserved the inside front cover of *Teens and Boys Magazine* to advertise its "CHIPS" trademarked goods. *Teens and Boys Magazine* is a trade publication directed to members of the apparel industry who are interested in the boys' and young men's market. The young men's market includes males of high school and college age.

26. Plaintiff also advertises in the trade publications *Apparel Retailer, The Daily News Record,* and the *Teens and Boys Trade Directory.*

27. In addition to this advertising, Chips has received without cost to it the benefit of advertising and promotion by others:

(a) Department stores frequently feature plaintiff's trade name and trademarks in advertisements they place because they consider Chips' name to be prestigious and wish their names to be associated with it.

(b) To help sell their products, fabric manufacturers whose goods are used by Chips have featured plaintiff's name in their advertising.

28. The items of wearing apparel currently sold under the "CHIPS" family of trademarks are highly-styled and exemplify the now fashionable "European" cut.

29. All items of wearing apparel manufactured by Chips and its predecessors have been and are made in the United States in conformity with high standards of quality and workmanship.

30. Chips is the only manufacturer of boys' tailored clothes which has a national brand name recognized by the consumer. Chips is also known to the trade for the quality of its products and over the period of many years has established substantial goodwill in the "CHIPS" family of trademarks.

31. Chips has no licensees of its trademarks or trade name.

32. Plaintiff considers its trade name, "CHIPS 'N TWIGS, INC." and its "CHIPS" family of trademarks to be its most valuable asset.

33. At the time of the hearing in this matter plaintiff had approximately 4000 active retail sales accounts located throughout the continental United States and Hawaii. During the fiscal year ending April 30, 1975, plaintiff made sales of wearing apparel having a total value at retail of just under $10 million.

34. The "CHIPS" family of trademarks is entirely arbitrary as applied to wearing apparel.

35. The Patent Office has granted trademark registrations to a substantial number of other companies for trademarks using or incorporating the word "chip" or words phonetically similar to the word "chip" for various items of wearing apparel. However, many of these registrations have been cancelled, abandoned, or allowed to expire. Further, with two exceptions, noted below, no evidence has been presented as to whether any of these third party registrations are presently in use in commerce, or the nature and extent of such use.

36. CHIPP, INC. of 14 E. 44th Street, New York, New York is a company engaged in the retail sale of a full line of high quality, traditionally styled and expensively priced men's clothing. At least some of CHIPP, INC.'s clothing is sold under the trademark "CHIPPWORTH." The Patent Office issued Registration No. 755,137 to CHIPP, INC. for the trademark "CHIPPWORTH" for men's suits, sportcoats, slacks, topcoats and overcoats on August 20, 1963. There is no evidence as to which company—plaintiff or CHIPP, INC. —first used the trade name or trademark "CHIP" or derivatives thereof in commerce.

37. CHIPP, INC., sells men's clothing at retail only. Its sales are made directly to consumers at its retail store in New York City and through mail order catalogs. CHIPP, INC., may also have a store in New Haven, Connecticut, although the evidence was unclear on this point.

38. CHIPP, INC., conducts business through different channels of trade than either Chips or Chip-Chip and its men's wearing apparel is sold to a different class of customers than either plaintiff's or defendant's goods. Because of these differences, Chips, though it has been aware of the existence of CHIPP, INC., for at least five years, has taken no action to prevent it from using the trade name "CHIPP, INC." or the trademarks "CHIPP" or "CHIPPWORTH." Since plaintiff is a manufacturer selling to the trade nation-

wide through salesrooms and sales representatives and CHIPP, INC., is a retailer selling to a limited clientel in a limited area, there is little or no likelihood of confusion between plaintiff and its goods and CHIPP, INC., and its goods.

39. The Patent Office issued Registration No. 737,936 to International Shoe Co. on September 18, 1962, for the trademark "CHIP–CHEK" for men's industrial-type shoes having special soles. Plaintiff initially opposed the registration of "CHIP–CHEK" but on July 3, 1962, withdrew its opposition based upon International Shoe Co.'s amendment of its application. The substance of this amendment is not in evidence in these proceedings. There is no evidence of present use in commerce of the trademark "CHIP–CHEK." In any event, because of the limited and highly specialized use for which "CHIP–CHEK" shoes are made and the persons to whom they are sold, there is little or no likelihood of confusion between Chips' products and those of International Shoe Co.

40. From 1969 to the present time DALSCO, INC., has been engaged in the manufacture, importation, and sale of men's, women's and unisex sportswear under the trademark "VIOLA–CHIP." During this time DALSCO's total sales approximated eight million dollars. There is no evidence that DALSCO, INC., ever conducted a trademark search prior to adopting the trademark "VIOLA–CHIP."

41. Mr. Saft, Chips' executive vice-president who is responsible, *inter alia,* for its trademarks, first heard of the "VIOLA CHIP" trademark around the end of 1974 or the beginning of 1975. There was no evidence that "VIOLA–CHIP" branded merchandise was ever advertised in media directed to the ultimate consumer, and substantially all of its trade advertising was done in *Boutique Fashion Magazine,* a trade publication directed to members of the apparel industry who are interested in very high fashion young men's and young women's wear and which is not regularly reviewed by Mr. Saft.

42. Chips took no action against DALSCO's use of "VIOLA–CHIP" because Saft believed that the mark was being used only in connection with ladies shirts and sweaters. According to the testimony of Russell Malen, during the time he was with DALSCO, INC., *i. e.* from May through November, 1974, 85 per cent of its business was in the women's sportswear line.

43. Plaintiff has acted with reasonable promptness at all times to prevent others from using trademarks it deemed to infringe upon its "CHIPS" family of trademarks. See *Chips 'N Twigs v. Prives,* 226 F.Supp. 529 (N.D.Cal.1963); *Chips 'N Twigs v. Blue Jeans Corp.,* 146 F.Supp. 246 (E.D. Pa.1956).

44. Russell Malen and Brad Coogan, principals of defendant CHIP–CHIP, LTD., are former employees and/or principals of DALSCO, INC. In September of 1974, Malen, Coogan, and a third principal of DALSCO, INC., Robert Scher, began making plans to leave DALSCO, INC. At about this same time Malen and Coogan adopted the trademark "CHIP–CHIP" for men's shirts.

45. Defendant's business was started in September, 1974, as a division of DALSCO, INC.

46. During October, November and December, 1974, DALSCO, INC., booked orders for $750,000. worth of "CHIP–CHIP" labelled men's shirts. By the end of November, 1974, orders for "CHIP–CHIP" branded merchandise exceeded orders for "VIOLA–CHIP" branded merchandise by a ratio of between 2½ and 3 to 1.

47. By agreement dated November 15, 1974, Messrs. Malen, Coogan, and Scher left DALSCO, INC., and formed CHIP–CHIP, LTD. This agreement provided, *inter alia,* that in exchange for the return of stock in DALSCO by Coogan and Scher, they and Malen would take the booked, but as yet unfilled orders for "CHIP–CHIP" branded merchandise.

48. Sometime between September and early December, 1974, Mr. Malen requested that a trademark search be performed to

determine the availability of the trademark "CHIP–CHIP" for men's and women's shirts.

49. On December 19, 1974, defendant's attorney reported the results of a trademark search of the United States Patent Office, noting that only Registration No. 836,876 for the trademark "CHIP" for men's shave cream had been found. The report also stated that no search of common law trademarks, state trademark registrations, or business titles had been conducted, and recommended that an extended search in these areas be conducted before a substantial investment was made in the proposed mark.

50. Notwithstanding advice of counsel, Chip-Chip had no further trademark search conducted until after the instant litigation was commenced. On November 20, 1975, six days after the complaint in the case *sub judice* was filed, another search of the Patent Office was conducted on behalf of Chip-Chip. This second search revealed all of plaintiff's registered "CHIPS" family of trademarks.

51. Had a reasonably adequate trademark search of the Patent Office been performed between September and December, 1974, the existence of plaintiff's registered "CHIPS" family of trademarks would have been discovered.

52. At the hearing there was evidence that defendant had begun to manufacture some wearing apparel domestically, but had not yet shipped any domestically made goods to customers. To date substantially all of defendant's "CHIP–CHIP" branded merchandise is manufactured in Taiwan, Korea, Hong Kong and other locations in the Orient.

53. Defendant initially imported men's shirts and sweaters under the "CHIP–CHIP" mark, the first shipment being received in this country approximately at the end of February, 1975. During May and June, 1975, defendant imported and sold "CHIP–CHIP" branded unisex cotton shirts. Defendant is in the process of introducing a line of women's shirts and other wearing apparel, also to be imported from the Orient, under the trademark "CHIP–CHIP" or "CHIP–CHIP FOR CHICKS," however, as of January 6, 1976, the last day of the hearing in this matter, no women's garments bearing these trademarks had been imported. There are also plans underway for defendant to introduce a line of "CHIP–CHIP" trademarked men's slacks.

54. Defendant sells directly to retailers and has approximately 2000 active sales accounts. During the 14 months of defendant's existence prior to the hearing in this matter, it sold approximately four million dollars worth of "CHIP–CHIP" branded merchandise, representing approximately 650,000 individual garments. Defendant anticipates sales of approximately $10 million for the current fiscal year.

55. During 1975 defendant spent approximately $60,000. on advertising and promotion of its "CHIP–CHIP" branded goods.

56. Defendant's "CHIP–CHIP" branded merchandise is sold in boutique shops and boutique or specialty departments of department stores throughout the country. Among the department stores at which such merchandise is sold are Gimbel Brothers, Strawbridge & Clothier and John Wanamaker. "CHIP–CHIP" branded merchandise is also sold at discount department stores such as Korvettes.

57. Plaintiff's merchandise bearing the "CHIPS" family of trademarks is sold in the boys and young men's departments of better department stores throughout the country. Among the department stores at which such merchandise is sold are Gimbel Brothers, Strawbridge & Clothier and John Wanamaker. Plaintiff's merchandise is not sold at discount department stores such as Korvettes.

58. Defendant advertises in *Boutique Fashions Magazine* which also carries advertisements for articles of wearing apparel intended for boys and young men.

59. Chip-Chip does not advertise in *Teens & Boys Magazine,* in which Chips does advertise. However, *Teens & Boys Magazine* carries advertisements for the

Boutique show at which defendant's goods are promoted.

60. There is no substantial difference between the appearance or manner in which plaintiff's and defendant's trademarks and trade names are displayed.

61. There is considerable overlap in the markets and channels of trade through which Chips' goods and Chip-Chip's goods are sold. There is also considerable overlap between those who purchase plaintiff's goods and those who purchase defendant's goods.

62. Both Chips' and Chip-Chips' goods are moderately priced articles of clothing.

63. Moderately priced clothing articles are not major expenditures for most purchasers and therefore such purchasers generally do not exercise the same degree of care in buying them as they do when purchasing items such as automobiles, television sets, or home appliances.

64. Consumers do not look carefully at the labels on moderately priced articles of clothing, but rather purchase such items primarily on the basis of style, color, fit, and appearance.

65. Use of the trademark "CHIP–CHIP" and trade name "CHIP–CHIP, LTD." in connection with men's and women's shirts, slacks, etc., suggests some connection, association or affiliation with plaintiff and its "CHIPS" family of trademarks.

66. Federal law requires the label of each garment made abroad to state the nation in which it is manufactured. Although there is no evidence that defendant's merchandise is of inferior qualify, it is commonly believed by some consumers that wearing apparel manufactured in Hong Kong, Korea, and Taiwan is of lesser quality than goods manufactured in the United States. Because of this, plaintiff's reputation is injured when, due to the similarity between Chips' and Chip-Chip's trademarks, consumers mistakenly believe that Chips is importing wearing apparel from these countries.

67. Defendant filed an application seeking to register the trademark "CHIP–CHIP" for men's and women's shirts on June 2, 1975. In an Office Action dated February 12, 1976, a trademark examiner of the United States Patent Office refused registration of the trademark "CHIP–CHIP," finding that it so resembled plaintiff's registered trademarks "CHIPS" and "BLUE CHIPS" as to be likely to cause confusion, mistake or deception.

68. Mr. Saft first learned of defendant and its use of the trademark "CHIP–CHIP" in April of 1975. Saft conducted a preliminary investigation through Dun & Bradstreet and was led to believe (erroneously) that defendant was an importer of ladies sweaters only. Believing that this activity posed no threat to plaintiff's "CHIPS" family of trademarks, Saft took no further action against defendant at that time.

69. On or about October 1, 1975, Chip-Chip again came to Mr. Saft's attention when he learned from an ad in the October 1, 1975, *Daily News Record* that defendant had and was expanding its product line.

70. On October 1, 1975, or within several days thereafter, Mr. Saft telephoned Jack Camhe, secretary-treasurer of defendant, to request that defendant terminate further use of the trademark "CHIP–CHIP" and trade name "CHIP–CHIP, LTD." because such use infringed plaintiff's trademarks and trade name. Although there is sharp conflict in the evidence as to the discussion which Saft and Camhe had, the end result was that Camhe refused to discontinue use of defendant's trademark or trade name.

71. On October 16, 1975, in response to Mr. Saft's request, Chips' attorney wrote to Chip-Chip formally requesting that it cease and desist all infringing activities.

72. On October 24, 1975, Chip-Chip, by its attorneys, denied that it was infringing on Chips' trade name or trademark and refused to cease and desist from use of its trademark "CHIP–CHIP" and its trade name "CHIP–CHIP, LTD."

73. Subsequent to the notice referred to in finding No. 70, Chip-Chip has increased the importation and sale of goods under its

trademark and trade name and has made plans to expand its product line.

74. Defendant's trade name "CHIP–CHIP, LTD." and trademark "CHIP–CHIP" as applied to wearing apparel is confusingly similar to plaintiff's "CHIPS" family of trademarks as applied to wearing apparel.

75. There has been actual confusion between Chips' and Chip-Chip's goods as a result of defendant's use of the trademark, "CHIP–CHIP." On one occasion Mr. Saft telephoned Strawbridge & Clothier and asked for "CHIP–CHIP" merchandise. The salesperson to whom he spoke directed Saft to the boys' department of the store, where Chips' goods are sold and Chip-Chip's are not. On another occasion Herbert Berger, a New Jersey salesman for plaintiff, informed Mr. Saft that he had received inquiries as to whether Chip-Chip's merchandise was being imported by Chips.

76. The production of Chip-Chip's goods in the Orient is financed through irrevocable letters of credit payable against documents.

77. Several months pass between the time products are ordered for manufacture and the time they arrive in the United States.

78. As of January 6, 1976, the last day of the hearing on the motion for a preliminary injunction, defendant had approximately $750,000. worth of "CHIP–CHIP" branded merchandise in inventory in the United States and approximately $3 million worth of "CHIP–CHIP" branded merchandise either in transit from the Orient, packaged and awaiting shipment, or in the final stages of manufacture. This merchandise is covered by irrevocable letters of credit. In addition, as of January 6, 1976, defendant was committed to the manufacture of a million dollars worth of merchandise to be

received in the United States in March, 1976, and a million dollars worth of merchandise to be received in the United States in April, 1976.

79. Each of defendant's garments contains a sewn-in label bearing its "CHIP–CHIP" trademark, buttons containing the "CHIP–CHIP" trademark, carries hang tags bearing the "CHIP–CHIP" trademark and the trade name "CHIP–CHIP, LTD.," and is packaged in a plastic bag containing the trademark "CHIP–CHIP" and the trade name "CHIP–CHIP, LTD." It would be extremely difficult and costly to remove all labels, hang tags, etc. bearing defendant's name or mark from the garments referred to in finding of fact No. 78, and if these items were removed the garments could be sold for no more than 30 percent of their original value.

80. The words "CHIP–CHIP" or the letters "CC" are imprinted within the design of several fabrics utilized in defendant's shirts. There is no way that these designs could be removed or altered on cloth that has already been manufactured.

81. As of the date of the hearing (January 6, 1976), some time in April, 1976, would have been the earliest date that defendant could import goods from the Orient under a trademark other than "CHIP–CHIP."

## CONCLUSIONS OF LAW AND DISCUSSION

 A preliminary injunction may be granted only when there has been a showing of (1) probability of ultimate success on the merits, and (2) irreparable injury *pendente lite* if the injunction is not granted. *Tefal, S.A. v. Products International Co.,* 529 F.2d 495, 497 (3d Cir. 1976); *Bose Corp. v. Linear Design Labs, Inc.,* 467 F.2d 304, 306 (2d Cir. 1972).[2] The applicant for such

2. Of course, in conducting the delicate balancing of equities, *Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, Inc.,* 268 F.2d 569, 574 (3d Cir. 1959); *Chips 'N Twigs, Inc. v. Blue Jeans Corp.,* 146 F.Supp. 246, 248 (E.D.Pa. 1956), that goes into the determination of whether likelihood of success and irreparable injury are present, the court must also consider

the possible injury to defendant from granting the injunction and where the public interest lies. *A. O. Smith Corp. v. Federal Trade Comm.,* 530 F.2d 515, 525 (3d Cir. 1976); *Corning Glass Works v. Jeannette Glass Co.,* 308 F.Supp. 1321, 1325 (S.D.N.Y.) aff'd 432 F.2d 784 (2d Cir. 1970); *Carling Brewing Co. v. Phillip Morris, Inc.,* 277 F.Supp. 326, 334 (D.Ga.1967). See

relief bears the burden of establishing each of these elements. *A.O. Smith Corp. v. Federal Trade Comm.*, 530 F.2d 515, 525 (3d Cir. 1976); *Joseph Bancroft & Sons Co. v. Shelley Knitting Mills, Inc.*, 268 F.2d 569, 574 (3d Cir. 1959). I believe that plaintiff has satisfied its burden in this regard and is therefore entitled to a preliminary injunction.

## A. *Likelihood of Success*

 In order to measure Chips' likelihood of success on the merits it is necessary to review the facts in light of the applicable statutory and judicial authority. Plaintiff's first cause of action is for statutory trademark infringement.[3] Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1) provides:

(1) Any person who shall, without the consent of the registrant—

(a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with *which such use is likely to cause confusion*, or to cause mistake, or to deceive; or

(b) reproduce, counterfeit, copy, or colorably imitate a registered mark and apply such reproduction, counterfeit, copy, or colorable imitation to labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with *which*

also *Oburn v. Shapp*, 521 F.2d 142, 147 (3d Cir. 1975).

3. Because I conclude that plaintiff is entitled to a preliminary injunction on its statutory trademark infringement claim, I find it unnecessary to consider plaintiff's other claims.

4. Section 1114(1) is not available to protect plaintiff's unregistered trademark "CHIP–KNITS" since by its terms that section applies only to "registered marks." However, because the relief I grant plaintiff in respect of its registered marks will also protect its unregistered

*such use is likely to cause confusion*, or to cause mistake, or to deceive.

shall be liable in a civil action by the registrant for the remedies hereinafter provided. Under subsection (b) of this section, the registrant shall not be entitled to recover profits or damages unless the acts have been committed with knowledge that such imitation is intended to be used to cause confusion, or to cause mistake, or to deceive.[4] (Emphasis added.)

Thus, the test of trademark infringement under the Act, as at common law, is not actual confusion, but "likelihood of confusion."[5] *Roto-Rooter Corp. v. O'Neal*, 513 F.2d 44, 45 (5th Cir. 1975); *Boston Professional Hockey Association, Inc. v. Dallas Cap & Emblem Mfg., Inc.*, 510 F.2d 1004, 1012 (5th Cir. 1975); *Baker v. Simmons Co.*, 307 F.2d 458, 461 (1st Cir. 1962); *Sears Roebuck & Co. v. Johnson*, 219 F.2d 590, 592 (3d Cir. 1955); *Telechron, Inc. v. Telicon Corp.*, 97 F.Supp. 131 (D.Del.1951), aff'd. 198 F.2d 903 (3d Cir. 1952). As pointed out in *Sears Roebuck & Co. v. Johnson*, supra, 219 F.2d at 592; *Robert Bruce, Inc. v. Sears Roebuck & Co.*, 343 F.Supp. 1333, 1345 (E.D. Pa.1972); and *Franklin Mint, Inc. v. Franklin Mint, Ltd.*, 331 F.Supp. 827, 831 (E.D.Pa. 1971), the factors to be considered when determining if likelihood of confusion exists are those set forth in Section 729 of the *Restatement of Torts*:

(a) the degree of similarity between the designation and the trademark or trade name in

(i) appearance;

(ii) pronunciation of the words used;

mark, I need not consider whether the latter would be entitled to protection under other sections of the Lanham Act or on common law principles.

5. Of course, because of the difficulty in obtaining evidence of confusion, any evidence of actual confusion is substantial evidence of likelihood of confusion. *Tisch Hotels, Inc. v. Americana Inn, Inc.*, 350 F.2d 609, 612 (7th Cir. 1965); *Harold F. Ritchie, Inc. v. Cheesebrough-Ponds, Inc.*, 281 F.2d 755, 761 (2d Cir. 1960). I have found evidence of actual confusion in this case.

(iii) verbal translation of the pictures or designs involved;

(iv) suggestion

(b) the intent of the actor in adopting the designation;

(c) the relation in use and manner of marketing between the goods or services marketed by the actor and those marketed by the other;

(d) the degree of care likely to be exercised by purchasers.

At the hearing and in their brief, defendant's counsel have gone to great lengths in attempting to demonstrate the differences with respect to each of the above factors between Chips' and Chip-Chip's marks. They argue that defendant's mark as presented on garment labels, hang tags and in advertising is significantly different in appearance from the way plaintiff's marks are presented. I have examined the exhibits presented by the parties which show Chips' marks and Chip-Chip's mark as used in various items and in their respective advertising. Unquestionably there are differences in appearance: several of plaintiff's marks contain the word "Chips" fancifully formed from vines or leaves. In plaintiff's "MR. CHIPS" mark the lettering is plain and conventional. "BLUE CHIPS" uses slanted capital letters and the picture of a woodsman chopping a log. Defendant's mark, on the other hand, features only its name in modern, bold, clear-cut letters.

While these distinctions afford the defendant its best argument, I am still convinced that the likelihood of confusion is substantial. In the first place, whatever the differences may be in color, letter-style, and other characteristics, the dominant part of each mark is a word, the same word, and a word that has absolutely nothing to do with clothing as such. Just as "Chips" is one way to express the plural of "Chip," so is "Chip-Chip." The very fact that plaintiff presents and uses the word "Chip" in several adaptations suggests that the "CHIP–

CHIP" mark is but another variation on the same theme, another member of the "CHIPS" family of trademarks. Secondly, where the marks are about the same size and intended for the same purpose (*i. e.*, garment label v. garment label), their differences become less apparent. Specifically, the "MR. CHIPS" garment label (see Exhibit G, No. X, to the plaintiff's complaint) and Chip-Chip's garment label (Exhibit A to Russel Malen's affidavit) bear a marked resemblance to each other.[6]

Thirdly, to the extent that there is a difference between the appearance of the parties' marks, its importance is mitigated by the fact that plaintiff's and defendant's products are not in direct competition with each other and probably will not be sold in the same department of any store. Consumers therefore would be unlikely to have the opportunity to make side by side comparisons.

This brings me to a consideration of the names themselves and of defendant's next argument, that the aural characteristics and pronunciation of the name "CHIP–CHIP" are "easily distinguishable" from those of any of the "CHIP" variety used by the plaintiff. As an example of this, defendant's counsel noted at the hearing that its mark uses the word "Chip" in the singular whereas all of plaintiff's registered marks use the plural form, "Chips."[7] The difference in sound between the one-syllable word, "Chips," and its two-syllable counterpart, "Chip-Chip," is minimal. Of course the sounds are not exactly the same, but the *Restatement's* "pronunciation" test does not hinge on exact similarity. Rather it is intended to recognize the significance of sounds that are the same even though they may be provoked by differences in word-form or spelling. *Restatement of Torts* § 729, comment c, at 594; cf. *Communications Satellite Corp. v. Comcet, Inc.,* 429 F.2d 1245, 1251 (4th Cir.) cert. denied 400 U.S. 942, 91 S.Ct. 240, 27 L.Ed.2d 245 (1970)

---

**6.** Attached hereto as Appendices A and B respectively are copies of Chips' and Chip-Chip's trademarks.

**7.** Only plaintiff's unregistered mark "CHIP–KNITS" uses the word "Chip" in the singular.

(*"Comsat" v. "Comcet"*); *Telechron, Inc. v. Telicon Corp.*, supra, 198 F.2d at 908 (*"Telechron" v. "Telicon"*). The question is whether the pronunciation of the sound "Chip-Chip" generates an auditory response that calls to mind or may be confused with the sound "Chips." I conclude that it does. Moreover, as a comment in the *Restatement* points out, "While individual features may be dissimilar, the total effect may be one of similarity. *Restatement of Torts* § 729, comment *b*, at 593; see *Robert Bruce*, supra, 343 F.Supp. at 1345 quoting 3 Callman, *Unfair Competition, Trademarks and Monopolies* § 81.1, at 570.1 (1969 ed.). Considered as a whole the marks of plaintiff and defendant are quite similar.

On the questions of the verbal translation and the suggestion conveyed by the marks, Chip-Chip renews its assertions concerning the differences in appearance between its mark and Chips'. I have already considered and rejected these arguments. In addition, Chip-Chip contends that the dominant theme of Chips' trademarks, trade name, and advertising scheme is to suggest the image that boys dressing in plaintiff's clothing will look like their fathers, or like "chips off the old block." Although some of Chips' advertising does attempt to suggest the "chips off the old block" image, this is not a sufficient distinction, first because not all of Chips' advertising attempts to convey this theme, and secondly because Chips' mark when used other than in advertising *i. e.*, on garment labels and hang tags, does not convey this idea. More importantly, the very fact that plaintiff has attempted to convey the "chips off the old block" image may lead to confusion between Chip-Chip's and Chips' goods. Consumers familiar with this advertising scheme may very well believe that Chips manufactures clothing for men as well as boys (*i. e.* for the "blocks" as well as the "chips") under the "CHIPS" family of trademarks and may therefore assume that Chip-Chip's men's shirts are manufactured by Chips.

 Turning to the question of the defendant's intent, I note first that an action for trademark infringement does not depend on proof of wrongful or fraudulent intent and that good faith is no defense. *S. C. Johnson & Son, Inc. v. Johnson*, 266 F.2d 129, 142 (6th Cir.), cert. denied, 361 U.S. 820, 80 S.Ct. 65, 4 L.Ed.2d 65 (1959); *Telechron, Inc. v. Telicon Corp.*, supra, 198 F.2d at 908. While on this abbreviated record I have made no finding that Chip-Chip's principals actually knew of Chips' trademarks or intended to trade on Chips' good will, I nonetheless have found that had Chip-Chip conducted any sort of reasonable trademark search it would have discovered Chips' registrations. This finding weighs in favor of granting the relief Chips requests, for surely if it would be entitled to relief against a totally innocent infringer it is even more clearly entitled to relief against one who is guilty of at least some carelessness.[8]

 The defendant next argues that it is not guilty of infringement because the clothing to which its mark is applied is unrelated to Chips', is sold through different channels of trade and to a different class of customer. There is no doubt that

---

**8.** Though not a defense, the actor's intent is an important factor in determining whether or not a likelihood of confusion exists, *Ortho Pharmaceutical Corp. v. American Cyanamid Co.*, 361 F.Supp. 1032, 1043 (D.N.J.1973); *A. T. Cross Co. v. Jonathan Bradley Pens, Inc.*, 355 F.Supp. 365, 370 (S.D.N.Y.) aff'd, 470 F.2d 689 (2d Cir. 1972), the rationale being that if the actor adopted the allegedly infringing mark with the intention of reaping benefits from the other party's reputation, his judgment that the mark would have this effect is highly persuasive that it would be likely to confuse, *Restatement of Torts* § 729, comment *f*, at 595.

Although I need not reach the matter now, it is to be noted that in view of the close resemblance between plaintiff's and defendant's marks, their use on closely related goods, Chips' long prior use of its mark, and Chip-Chip's continued use of its mark after receipt of notice of infringement from plaintiff, substantial authority would support a presumption of wrongful intent. See *Standard Oil Co. v. Standard Oil Co.*, 252 F.2d 65, 76 (10th Cir. 1958); *Lambert Pharmacal Co. v. Kalish Pharmacy*, 219 F. 323 (C.C.N.Y.1911); *Ye Olde Tavern Cheese Products, Inc. v. Standard Brands, Inc.*, 261 F.Supp. 200, 204–05 (D.Ill.1966), aff'd 394 F.2d 833 (7th Cir. 1967); *Kelly Girl Service, Inc. v. Roberts*, 243 F.Supp. 225, 228 (E.D.La. 1965).

Chips' and Chip-Chip's products are not identical[9] and neither are the markets for which they compete.[10] However to suggest that the goods manufactured by these parties are unrelated is to ignore reality: both are moderately priced articles of wearing apparel, both are sold in the same department stores, albeit in different departments; and the markets for Chips' and Chip-Chip's products do overlap to some extent. For example, a boy of say 15 or 16 years of age might wear one of Chips' leisure suits with a shirt manufactured by Chip-Chip, or an adult might purchase a Chip-Chip shirt or sweater for himself and buy one of Chips' sportcoats for his son. In short, the relationship between Chips' and Chip-Chip's goods is such that it would be entirely reasonable (given the similarity between the trademarks) for the consumer to suppose they originate from the same source. See *Sweetarts v. Sunline, Inc.,* 380 F.2d 923, 927 (8th Cir. 1967); *King Research, Inc. v. Shulton, Inc.,* 324 F.Supp. 631, 637 (S.D.N.Y.1971) aff'd. 454 F.2d 66 (2d Cir. 1972); *Baker,* supra, 307 F.2d at 462. Moreover, the "CHIPS" family of trademarks is completely arbitrary and fanciful as applied to wearing apparel; it has been used over a long period of time and has been extensively advertised. These considerations lead inescapably to the conclusion that the "CHIPS" family of trademarks are strong marks and as such are entitled to protection from use of confusingly similar marks even on non-competing goods, especially where the goods are related in character. *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d 149, 151 (9th Cir.), cert. denied 374 U.S. 830, 83

S.Ct. 1870, 10 L.Ed.2d 1053 (1963); *Alfred Dunhill, Inc. v. Kasser Distillers Products Corp.,* 350 F.Supp. 1341, 1357–58 (E.D.Pa. 1972), aff'd 480 F.2d 917 (3d Cir. 1973); *Robert Bruce,* supra, 343 F.Supp. at 1346–47; *Waterman-Bic Pen Corp. v. Beisinger Industries Corp.,* 321 F.Supp. 178, 180 (S.D. N.Y.1970); *Villager, Inc. v. Dial Shoe Co.,* 256 F.Supp. 694, 702 (E.D.Pa.1966).

The final factor to be considered under the *Restatement* analysis is the degree of care likely to be exercised by purchasers of the goods in question. I have found as a fact that items of moderately priced wearing apparel are not major investments for the average purchaser. Rather such items of clothing, being a necessity that must be obtained fairly regularly, are purchased primarily for reasons of style or appearance and with only minimal attention given to the trademark or trade name appearing on the labels. The similarity between Chip-Chip's and Chips' marks and names in sound, appearance, etc. is such that even a person exercising a high degree of care and intending to purchase items of clothing on the basis of the trademark or trade name they carry would be likely to believe that there is some connection between Chips and Chip-Chip. The probability that confusion will occur can only be enhanced by the fact that most consumers are unlikely to purchase either parties' goods in a painstaking manner. See, e. g., *Coca Cola Co. v. Gemini Rising, Inc.,* 346 F.Supp. 1183, 1189–90 (E.D.N.Y.1972); *Robert Bruce,* supra, 343 F.Supp. at 1348 n. 30; *Restatement of Torts* § 729, comment *g,* at 596.[11]

---

9. At the present time defendant sells predominantly men's shirts and sweaters, although it has begun or will soon begin to sell women's shirts and sweaters and men's and women's slacks. Plaintiff sells no shirts or sweaters.

10. The wearing apparel sold by defendant is designed to be worn by young adult men and women, *i. e.,* people ranging in age from the mid to late teens through the thirties. Plaintiff's men's clothing for the same age group is sold under the "ACADEMY CLOTHES" trademark. The items sold by plaintiff under its "CHIPS" family of trademarks are designed to be worn by boys ranging in age from approxi-

mately six to sixteen, although older, adult men of small build sometimes do wear such items. Defendant's goods are sold in boutique shops and boutique departments of department stores. Plaintiff's "CHIPS" branded goods are not sold in boutique shops, but are sold in boys' departments of major department stores.

11. To the extent that some consumers may not give any attention *at all* to trademarks or trade names in purchasing moderately priced wearing apparel, there would be no likelihood that such persons *initially would purchase* defendant's products believing them to have been manufactured by plaintiff. However, if a con-

One additional matter requires some discussion. Chip-Chip makes much of the fact that there are a number of third party registrations for trademarks including the word "Chip" or words phonetically similar to it for various items of wearing apparel. There is no question that third party *use* of similar marks is relevant on the question of likelihood of confusion between plaintiff's and defendant's marks. *Lucien Piccard Watch Corp. v. Crescent Corp.*, 314 F.Supp. 329, 333 (S.D.N.Y.1970); see *Jean Patou, Inc. v. Jacqueline Cochran, Inc.*, 201 F.Supp. 861, 865 (S.D.N.Y.1962), aff'd 312 F.2d 125 (2d Cir. 1963). As stated in comment *g* to *Restatement* § 729, "The greater the number of identical or more or less similar trademarks already in use on different kinds of goods, the less is the likelihood of confusion. . . ." See also *John Walker & Sons, Ltd. v. Bethea*, 305 F.Supp. 1302 (D.S.C.1969) where the court stated:

The degree of protection which should be afforded a trademark or trade name depends on the extent to which it has been diluted or used by others in the past and also upon the character of the particular trademark involved.

*Id.* at 1308. However the mere introduction of these third party registrations does not prove that the marks to which they apply are actually in use in commerce. *James Burrough, Ltd. v. Lesher*, 309 F.Supp. 1154, 1160 (S.D.Ind.1969). In fact, many of these registrations reveal on their face that they have been cancelled or abandoned or have expired. With the two exceptions noted below, plaintiff has failed to demonstrate any third party use of the word "Chip" or words similar to it in the apparel field. *Smith Bros. Manufacturing Co. v. Stone Manufacturing Co.*, 476 F.2d 1004 (CCPA 1973), is squarely on point in these circumstances. *Smith* involved an appeal from the dismissal of an opposition proceeding by the Trademark Trial and Appeal Board wherein the same likelihood of confusion standard involved here was applicable. The applicant sought to register the mark "MERRY CAPERS" for various items of infants, childrens and ladies wearing apparel. The opposer relied on prior use of "CAPER CASUALS" for men's and boy's slacks and trousers. In response the applicant introduced thirteen third-party registrations consisting of or including the word "CAPER" or "KAPER." Concluding that there was indeed a likelihood of confusion between the applicant's and opposer's marks, the court added:

We have considered the cited third party registrations and accept them as evidence that the term "Caper" has in the past appealed to others in the clothes merchandising field as an appropriate term to use as a mark, or part of a mark, on various items of clothing. But in the absence of any evidence showing the *extent* of use of any of such marks or whether any of them are now in use, they provide no basis for saying that the marks so registered have had, or may have, any effect at all on the public mind so as to have a bearing on likelihood of confusion. The purchasing public is not aware of registrations reposing in the Patent Office and though they are *relevant*, in themselves, they have little evidentiary *value* on the issue before us. (Emphasis in original.)

*Id.* at 1005; see *David Crystal, Inc. v. Shelburne Shirt Co.*, 465 F.2d 926, 927, 59 CCPA 1248 (1972); *Turner v. HMH Publishing*

---

sumer who purchased one of defendant's garments in such a manner later became dissatisfied with the garment he might *then* take notice of its trademark or trade name and determine not to purchase garments bearing that mark or name in the future. Even if such a person did not thereafter affirmatively rely on trademarks, or trade names in buying moderately priced wearing apparel, he might nonetheless use defendant's mark or name as a negative factor in making selections, *i. e.*, he might decide *not to* purchase any garments bearing defendant's mark or name. Of course, the similarity between plaintiff's and defendant's marks and names makes it likely that any such decision by a purchaser would work to plaintiff's disadvantage. The benefits to plaintiff that accrue from protecting its name by doing whatever is necessary to make a satisfactory adjustment as to returned merchandise are at best removed from its control and at worst completely negated.

*Co.,* 380 F.2d 224, 228 n. 2 (5th Cir.), cert. denied 389 U.S. 1006, 88 S.Ct. 566, 19 L.Ed.2d 601 (1967). *James Burrough,* supra, 309 F.Supp. at 1160.

■ As to one of the only two third parties shown to be using the word "Chip" in the wearing apparel field, the retailer CHIPP, INC. of New York and possibly New Haven, I have concluded that its products and the channels of trade through which it deals are sufficiently different from plaintiff's that it has not diluted the strength of Chips' marks. See *W. E. Bassett & Co. v. Revlon, Inc.,* 435 F.2d 656, 661 (2d Cir. 1970); *Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 614 (7th Cir. 1965); *Fleischmann Distilling Corp.,* supra, 314 F.2d at 160; *James Burrough, Ltd.,* supra, 309 F.Supp. at 1160.[12]

■ The only other evidence of use of the word "Chip" in the apparel field is the use by DALSCO, Inc., the corporation with which defendant's principals were formerly associated, of the trademark, "VIOLA–CHIP." I have accepted Mr. Saft's testimony that after learning of the use of "VIOLA–CHIP," he took no action against DALSCO because he believed they were selling *only* ladies shirts and sweaters and did not consider such use of that mark a threat to plaintiff. But even if it were shown that use of the trademark "VIOLA–CHIP," or for that matter the use of the trade name "CHIPP, INC." or the trademark "CHIPPWORTH," did infringe plaintiff's marks,[13] this would be irrelevant to the question of plaintiff's right to relief as against the defendant herein. *Heaton Distributing Co. v. Tank Car Co.,* 387 F.2d 477, 485 (8th Cir. 1967); *Tisch Hotels,* supra, 350 F.2d at 614; *Fleischmann Distilling Corp.,* supra, 314 F.2d at 160; *United States Jaycees v. San Francisco Jr. Chamber of Commerce,* 354 F.Supp. 61, 73 (N.D.Cal.1972), aff'd. 513 F.2d 1226 (9th Cir. 1975); *James Burrough,* supra, 309 F.Supp. at 1160.[14]

For the reasons set forth above I conclude that plaintiff has shown a strong likelihood of success on the merits of this action.

## B. IRREPARABLE HARM

■ Little need be said about irreparable harm. Because of the confusing similarity between Chips' and Chip-Chip's marks as used in commerce, the purchasing public is likely to believe that goods sold under these marks originate from the same source. Since this is not in fact true, however, plaintiff has absolutely no control over the quality of defendant's goods. These two factors combine to result in Chips' loss of control over its own reputation. Whether or not Chip-Chip's goods are of inferior quality, this loss of control would, without more, constitute irreparable harm. *Ambassador East, Inc. v. Orsatti,* 257 F.2d 79, 82 (3d Cir. 1958); *Franklin Mint,* supra, 331 F.Supp. at 830. Here, however, there is more.

Although the absence of direct competition between Chips' and Chip-Chip's prod-

---

**12.** There is evidence that plaintiff consented to the registration of the mark "CHIP–CHEK" for a specialized type of men's shoes; however, there is no evidence that this mark has actually been used in commerce. In any event, even if "CHIP–CHEK" is in use in commerce, the goods to which it is applied are so different from plaintiff's that its use in no way dilutes the strength of plaintiff's mark. Compare *Villager, Inc. v. Dial Shoe Co., Inc.,* supra.

**13.** The trademark registration for the mark "CHIPPWORTH" lists April 22, 1959, as the first use in commerce. This is subsequent to plaintiff's first use of most of its "CHIPS" family of trademarks. However, there is no evidence as to the date the trade name "CHIPP, INC." was first adopted or used.

**14.** Although defendant raises the issue only tangentially, my findings of fact also make it clear that I do not believe plaintiff would be subject to the defense of laches with respect to either the "VIOLA–CHIP" or "CHIP–CHIP" marks. See, e. g., *A. T. Cross Co. v. Jonathan Bradley Pens, Inc.,* 470 F.2d 689 (2d Cir. 1972); *Mead Johnson & Co. v. Baby's Formula Service, Inc.,* 402 F.2d 19 (5th Cir. 1968); *Alfred Dunhill, Inc.,* supra; *Blue Bell, Inc. v. Ruesman,* 335 F.Supp. 236 (N.D.Ga.1971); *Gastown, Inc. of Delaware v. Gastown, Inc.,* 331 F.Supp. 626 (D.Conn.1971); *G. D. Searle & Co. v. MDX Purity Pharmacies, Inc.,* 275 F.Supp. 524 (C.D. Cal.1967).

uct lines (at least as the latter are presently constituted) makes loss of sales to plaintiff stemming directly from defendant's use of its mark unlikely, there is the probability of indirect sales loss through erosion of Chips' goodwill. Plaintiff has over a long period of time built up substantial goodwill in its "CHIPS" family of trademark through extensive sales and advertising of high quality clothing. Assuming, as I do, that Chip-Chip's goods are not of inferior quality, nonetheless substantially all of its merchandise is imported from Hong Kong, Taiwan, Korea and other countries in the Orient. Justifiably or not, a not insubstantial segment of the purchasing public believes that items of wearing apparel imported from these countries are of inferior quality to American made goods. To the extent that such consumers are led to believe that Chips, whose products all are American-made, is importing items from the Orient, its goodwill and reputation suffer. A further potential for erosion of Chips' goodwill stems from the fact that Chip-Chip's merchandise is sold in discount department stores. Mr. Saft testified that plaintiff's products are sold only in better department stores, usually in upstairs departments. Consumers seeing defendant's goods in discount stores and believing them to originate from Chips may well conclude that plaintiff has lowered the quality of its entire product line.

The injury to Chips' reputation and goodwill outlined above can never be accurately ascertained or compensated for. *Franklin Mint,* supra, 331 F.Supp. at 830; *Chips 'N Twigs v. Blue Jeans Corp.,* supra, 146 F.Supp. at 248. For this reason the fact that Chip-Chip might be financially able to respond in damages to any judgment ultimately rendered against it does not render it immune from a preliminary injunction. See *Carling Brewing Co.,* supra, 277 F.Supp. at 335.

Though a preliminary injunction is clearly warranted, the competing equities between the parties in this case requires that it be tailored with precision. In view of the fact that, at this stage of the pro-

ceedings, I have not found Chip-Chip guilty of any bad faith and the fact that there is a considerable supply of "CHIP–CHIP" branded merchandise in various stages of manufacture and distribution which could not readily be converted to carry a non-infringing trademark and trade name, I believe it would be inappropriate merely to order that defendant immediately cease all infringing activities. See *J. C. Penney Co., Inc. v. Security Tire & Rubber Co., Inc.,* 382 F.Supp. 1342, 1346 (E.D.Va.1974); *Alfred Dunhill,* supra, 350 F.Supp. at 1369. On the last day of the hearing in this matter, January 6, 1976, Jack Camhe, Chip-Chip's secretary-treasurer, testified that as of that date the earliest time that defendant could begin importing goods from the Orient under a different trademark and trade name would be sometime in April, 1976. Although Mr. Camhe did not specify exactly what part of April he was referring to, giving defendant the benefit of the doubt, I will assume he meant the end of the month or approximately four months from the date of the hearing. Approximately four and one-half months have elapsed since the hearing. Using Mr. Camhe's testimony as a yardstick, it now would be approximately September 15, 1976, before defendant could import its merchandise under a different mark. Therefore I believe it appropriate that the preliminary injunction provide that: (1) defendant immediately cease all use (including use in advertising) of its trade name "CHIP–CHIP, LTD." except insofar as that name may appear on labels, hang tags or packaging of garments that have already been manufactured or garments that are to be manufactured under present contracts; (2) defendant immediately cease entering into any additional contracts for the manufacture of wearing apparel bearing the trademark "CHIP–CHIP" or trade name "CHIP–CHIP, LTD." whether or not the goods to be manufactured under such contracts would be completed before September 15, 1976; (3) notwithstanding provisions (1) and (2) above, defendant cease the manufacture or importation of all wearing apparel bearing the trademark "CHIP–CHIP"

or trade name "CHIP–CHIP, LTD." by September 15, 1976.[15]

In summary, I conclude:

1. This court has jurisdiction of the parties and the subject matter and venue is properly laid in this district;

2. There is a strong likelihood that plaintiff will succeed on the merits since defendant's trade name, "CHIP–CHIP, LTD." and its trademark "CHIP–CHIP," is confusingly similar to plaintiff's trade name "CHIPS 'N TWIGS, INC." and its "CHIPS" family of trademarks as these names and marks are used in connection with the sale, offering for sale, distribution, and advertising of wearing apparel;

3. The "CHIPS" family of trademarks are strong marks and as such are entitled to protection from use by the defendant of its confusingly similar trade name and trademark on items which although not in direct competition with plaintiff's goods are related in character;

4. The third-party trademark registrations using the word "Chip" or phonetically similar words, do not establish use in commerce of those marks nor do the registrations constitute a defense to this action or preclude plaintiff's obtaining injunctive relief;

5. Neither the use by CHIPP, INC. of its trade name or its trademark nor the use by DALSCO, INC., of its trademark constitute a defense to this action or preclude plaintiff's obtaining injunctive relief;

6. If the defendant's use of its confusingly similar trade name and trademark continue during the pendency of this action, plaintiff will be irreparably harmed by reason of plaintiff's loss of control over its reputation and the probable erosion of its good will;

7. Plaintiff is entitled to a preliminary injunction; and

8. The competing equities between the parties require that defendant be given a reasonable time to dispose of its inventory and contractual commitments, a result which the attached order will accomplish.

## ORDER

AND NOW, this 19th day of May 1976, for the reasons set forth in the foregoing opinion it is hereby Ordered that pending final adjudication of this matter:

1. defendant immediately cease all use (including use in advertising) of its trade name "CHIP–CHIP, LTD." except insofar as that name may appear on labels, hang tags or packaging of garments that have already been manufactured or garments that are to be manufactured under present contracts;

2. defendant immediately cease entering into any additional contracts for the manufacture of wearing apparel bearing the trademark "CHIP–CHIP" or trade name "CHIP–CHIP, LTD." whether or not the goods to be manufactured under such contracts would be completed before September 15, 1976; and

3. notwithstanding provisions (1) and (2) above, defendant cease the manufacture or importation of all wearing apparel bearing the trademark "CHIP–CHIP" or trade name "CHIP–CHIP, LTD." by September 15, 1976.

---

15. As indicated in the text, the September 15, 1976, deadline was arrived at by estimation based upon the testimony of Mr. Camhe. If either party believes that this date should be adjusted somewhat because of factors not in evidence at the hearing, counsel may petition for a further hearing immediately.