HILAND POTATO CHIP COMPANY,
Plaintiff,

v.

CULBRO SNACK FOODS,
INC., Defendant.

Civ. No. 81–198–D.

United States District Court,
S.D. Iowa, C.D.

Dec. 14, 1982.

Bruce W. McKee, Edmund J. Sease, Des Moines, Iowa, for plaintiff.

David H.T. Kane, New York City, Kent M. Forney, John Cortesio, Des Moines, Iowa, for defendant.

## FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

VIETOR, District Judge.

This action was submitted to the court under a stipulation for final judgment upon

the pleadings, depositions, documents, affidavits and other exhibits produced by each side and offered in support of their respective motions for preliminary injunctive relief, and the briefs submitted to the United States Court of Appeals for the Eighth Circuit on plaintiff's appeal of this court's preliminary injunction against plaintiff.[1]

## JURISDICTION

The court has jurisdiction pursuant to 15 U.S.C. § 1051, et seq.

## NATURE OF ACTION AND CLAIMS OF PARTIES

This is an action for trademark infringement and unfair competition. Each party seeks to enjoin the other's use of the mark Kitty Clover on potato chips in the Kansas City trade area. The Kansas City trade area comprises the Kansas City area in the state of Kansas, most of the state of Missouri, and Arkansas. Defendant Culbro Snack Foods, Inc. (hereinafter referred to as Culbro) has undisputed rights to Kitty Clover in the remainder of the United States.

The claim of plaintiff Highland Potato Chip Company (hereafter referred to as Hiland) is based on the alleged prior rights of its predecessors to the use of Kitty Clover in the Kansas City trade area. These rights were purportedly conveyed to Hiland through a series of assignments from Clary House to Cardinal Distributing Company and from Cardinal to plaintiff Hiland.

Culbro's counterclaim seeks to enjoin Hiland's use of Kitty Clover in the trade area. Culbro argues that Hiland's Kitty Clover mark was abandoned and, alternatively, that Hiland is estopped to deny abandonment.[2]

## FINDINGS OF FACT
### *Culbro's History*

Culbro's remote predecessor, a partnership by the name of Kitty Clover Potato Chip Company, began the manufacture of Kitty Clover brand potato chips in the mid-1930s at a plant in Omaha, Nebraska.

In 1938, the partnership registered its Kitty Clover brand name in the United States Patent Office under registration number 362,575. This registration is valid and subsisting and owned by Culbro.

By the 1950s, another Kitty Clover potato chip company plant was operating in Kansas City.

In 1956 an agreement was reached between the Lippold family operating the Kitty Clover Omaha plant and their cousins operating the Kansas City plant. The agreement allowed the Kansas City operation to make, use and sell Kitty Clover potato chips in the limited area served by the Kansas City plant, referred to as the Kansas City trade area.[3]

In 1959, the original Kitty Clover Omaha company was acquired by Culbro's immediate predecessor, Fairmont Foods Company. Under Fairmont's ownership, the Omaha plant continued production of Kitty Clover potato chips. The chips were distributed in

---

**1.** Stipulation and Order filed herein on August 26, 1982.

**2.** The parties are in disagreement as to whether another issue raised in Culbro's pleadings, assignment in gross, is before the court under the stipulated submission. Because the court's findings and conclusions on abandonment and estoppel are dispositive of this case, the court does not decide whether the assignment in gross issue is within the stipulated submission.

**3.** The Kansas City trade area is:
(a) all of the state of Missouri, except Forest City, Oregon, Fortescue, Mound City, Craig, Maryville, Rockport, Tarkio and Bigelow;

(b) in the state of Kansas, starting on Highway No. 73 at Hiawatha, but not including Hiawatha, all points on and east of a line in a southeasterly direction following Highways No. 73 and No. 7, to and including Bonner Springs; in addition, Wyandotte County and Johnson County, except therefrom Olathe, Gardner, Edgerton and Baldwin City; and

(c) all of the state of Arkansas, without any exceptions with respect thereto.

The portion of Kansas within the trade area is the Kansas City, Kansas, area.

a number of midwestern states including Nebraska, Iowa, South Dakota, Kansas, Oklahoma, Texas, Minnesota, Wisconsin, Colorado, Wyoming and Missouri.

In 1978, the Kitty Clover manufacturing plant in Omaha and other assets were sold by Fairmont to Culbro, which acquired not only the manufacturing plant but also the Kitty Clover trademark, its United States registration and the good will associated therewith.

Under Culbro's ownership, Kitty Clover sales have continued to grow, exceeding $3,900,000 in 1980 alone. Over the past 25 years, more than $84,000,000 worth of Kitty Clover potato chips have been manufactured and sold. Culbro's Kitty Clover business has been continuous and commercially successful. Sales of Kitty Clover brand potato chips from the same Omaha plant are, today, being made in a number of states surrounding the Kansas City trade area, i.e., Kansas, Missouri, Nebraska, Iowa, South Dakota, Minnesota, Colorado and Wyoming.

### Clary House

Hiland claims rights to Kitty Clover going back to the Kansas City Kitty Clover Company which was given the limited trade area rights under the 1956 agreement with Culbro's predecessor.

In the early 1970s, the Kansas City Kitty Clover Company changed its name to Clary House.

The Lippold cousins continued to operate the Kansas City company in the Kansas City trade area until its bankruptcy in September 1980.

The Clary House bankruptcy was the result of a severe business deterioration. Clary House ceased all manufacturing operations by the first week of October 1980.

While Clary House sought buyers for its various assets, it also sought to keep supplying customers with some products so as to maintain existing shelf space. To this end, Clary House approached defendant Culbro in October 1980 and arranged for Culbro to supply its Kitty Clover product for distribution to Clary House customers. Culbro's Kitty Clover brand potato chips were made by Culbro according to its own specifications, packaged in Culbro's distinctive packaging and labeled with the Culbro company name Snacktime, in addition to the Culbro mark Kitty Clover. Approximately 367,000 packages of Culbro's Kitty Clover potato chips were sold to Clary House for distribution by Clary's route trucks in October and November of 1980.

Following the Clary House bankruptcy, Culbro offered to buy whatever rights the bankrupt company had in the mark Kitty Clover for $7,500. This offer was not accepted and the Kitty Clover mark was subsequently included in the transfer of route trucks, customer lists and trade names to Cardinal Distributing Company.

### Clary House Sale to Cardinal

In mid-October 1980, Mr. Harold Balagna's Cardinal Distributing Company offered to buy the Clary House route trucks, customer lists and tradenames. The purchase price, when finally approved by the bankruptcy court in early November, was $195,000. Of this price, a figure of $15,000 was allocated to a total of three marks: Kitty Clover, Clary House and Cardinal.

Cardinal did not buy the Clary House manufacturing facilities, because Mr. Balagna was not interested in producing potato chips.

Cardinal sought a source of supply for a product to distribute. Mr. Balagna discussed with Culbro the possibility of Culbro supplying its Kitty Clover product. Culbro determined that it could not extend the credit terms required, so Mr. Balagna turned to Hiland as a supplier.

### Cardinal's Distributorship Agreement with Hiland

Cardinal Distributing Company signed a distributorship arrangement with Hiland on November 7, 1980. Pursuant thereto, Cardinal undertook to distribute Hiland brand potato chips to its customers. There was a clause in this agreement which gave Cardi-

nal the right to sell $50,000 worth of Kitty Clover products a year. However, Cardinal never exercised that right, although Cardinal did redistribute some returned Kitty Clover stock previously distributed by Clary House.

### Cardinal's Communication to Customers

George Kiefer, a long time Clary House sales executive, was employed as sales manager for Cardinal. Under date of November 10, 1980, Mr. Kiefer, in his capacity as Cardinal's sales manager, mailed a communication to Clary House customers, thousands of them, which in part states:

As you know, Clary House has been going through several crises which have resulted in numerous problems. Effective November 7, 1980, we became associated with Hiland Potato Chips, Inc. (Our New Company Name is Cardinal Distributing.) These changes will result in a much improved program, with a complete merchandised line of product as outlined in the enclosed price list.

\* \* \* \* \* \*

Because of the apparent lack of interest on the part of the large eastern corporation owning the Kitty Clover Brand Name, the new local business decided to become associated with, and to sell, Hiland Brand Potato Chips and Snacks. The Kitty Clover, Cardinal, and Clary House Brand names will be eliminated from Missouri and Arkansas.[4] This decision to introduce a new brand to most of you will make us part of one of the largest regional Brands in the United States. (All items will be under the Hiland Label.) Hiland Route Distribution will include the following states: South Dakota, Minnesota, Nebraska, Iowa, Illinois, Missouri, Kansas, Arkansas, and Oklahoma.—North and South through the Middle States of our country.

The enclosed price list included only "Hiland" brand products.

4. By "Missouri and Arkansas," Mr. Kiefer meant the Kansas City trade area, including the Kansas

Kiefer testified about the background and motive for the communication as follows:

On the Friday before the original letter—This is not a letter. This is the bulletin. Anyway, the Friday before when the bankruptcy was consumated, Mr. Balagna came to me during the proceedings and asked me what my thoughts were of distributing Hiland potato chips throughout our marketing area, and I thought, well I just had to gasp as a first reaction, and he said he had a problem with Kitty Clover.

He thought they [Culbro] were going to be his supplier and they hadn't come through and he was going to go ahead with Hiland, and did I think we could sell them.

I said this would be a much harder hill to climb than it would have been to just transfer to the Kitty Clover brand, and he said that's my decision, and I said okay.

So I thought about it over the weekend and we had been, as I earlier explained, going through quite a traumatic experience with various brands, UPC's, authorization list, unauthorized items, et cetera, almost daily, and so my first thing was that I wanted to solidify the program and to help my salesmen maintain their position, their space within the retail accounts, and I felt that my competitor, Kitty Clover, would—the same week that I was out there selling Hiland, would be out there selling Kitty Clover, attempting to get my space away from my customers, and I consider them to be my customers rather than Kitty Clover or Clary House's, and so I formulated this letter which was sent out on Clary House stationery.

And I didn't want to start it out by saying well, you know, we're bankrupt, so I used some flowery terms as a marketing entry into the letter, and tried to hold the accounts and the position within

portion. (Kiefer deposition at 142–43.)

those accounts by playing on their sympathy, and in the second paragraph I referred to good and loyal customers and fine sales organization, that had stuck with me through all of these problems we'd been going through the last months, and my sole purpose in doing this was to hope that they gave us a chance to prove ourself before they threw us out and put in Kitty Clover. [Kiefer deposition at 131–33.]

Mr. Balagna, the president of Cardinal, did not specifically authorize Mr. Kiefer to write the November 10 communication, but he saw the communication and did nothing to communicate a retraction of any statements in it. He testified in his deposition that he "didn't attach any significance to it because [Mr. Kiefer] was motivating sales people in a marketing program to make a change and I think that's about the position that we were in." (Balagna deposition at 15.)

### Culbro's Entry into Kansas City Trade Area

Immediately after the distribution of the November 10 Kiefer communication, Culbro learned of the communication and began distributing its Kitty Clover brand potato chips in the Kansas City trade area and continues to do so.

Culbro's decision to market Kitty Clover in the Kansas City trade area required some immediate revisions of its marketing structure. Prior to this time, Culbro had been selling its Kas brand in Kansas City. Culbro replaced Kas with Kitty Clover. The switch-over entailed active solicitation of new accounts who were advised that Kitty Clover was replacing the Kas brand, changes in warehousing, packaging sizes and inventory control, and a search for and selection of a distributor specifically to handle the Kitty Clover product. The newly appointed distributor left his previous employ in order to devote full time to the Kitty Clover distributorship. Culbro transferred to the newly established distributor its own route trucks and sale personnel. A switch back to Kas would, in addition to

damaging Culbro's credibility with its customers, be monetarily costly to Culbro.

As a result of Culbro's promotion of Kitty Clover in the trade area, over $40,000 worth of Kitty Clover chips were sold to 80 new accounts from November 1980 through May 1981, when Hiland brought its motion for preliminary injunction.

### Cardinal-Hiland Response

On November 19, 1980, Cardinal sent a notice of infringement to Culbro demanding that Culbro discontinue its use of Kitty Clover in the Kansas City trade area, but did not advise Culbro that Cardinal was using or intended to use Kitty Clover. The infringement claim was continuously asserted by Mr. Balagna on behalf of Cardinal and by Hiland, Cardinal's successor.

Mr. Balagna described his effort to preserve Kitty Clover as follows:

Well, I can say this that I had it [the Kitty Clover Mark] in my hip pocket ... if anything happened between my relationship with Peter Hunter [Hiland's President] and myself, I proposed to use that. [Balagna deposition at 39–40.]

During the period of nearly four months that Cardinal was functioning as distributor for Hiland, Cardinal made no distribution of potato chips under the Kitty Clover mark, except that it did retrieve some Kitty Clover chips previously distributed by Clary House from customers who no longer wanted them and resold those chips to other customers.

On February 28, 1981, Cardinal Distributing Company conveyed to Hiland its distribution routes, trucks, trademark rights and other assets and good will. Subsequently, Hiland began to distribute in the Kansas City trade area some of its potato chips under the Kitty Clover mark and continued to do so until the preliminary injunction was issued.

### FINDINGS OF ULTIMATE FACTS, CONCLUSIONS OF LAW AND DISCUSSION

15 U.S.C. § 1127 provides in part: "A mark shall be deemed to be 'abandoned'—

(a) When its use has been discontinued with intent not to resume. Intent not to resume may be inferred from circumstances."

■ A public announcement of intention to discontinue the sale of a product may be a circumstance from which an intent not to resume may be inferred. *See Sutton Cosmetics (P.R.), Inc. v. Lander Co.*, 170 U.S. P.Q. 461, 462 (S.D.N.Y.1971), *aff'd as modified*, 455 F.2d 285 (2d Cir.1972).

When a trademark has been abandoned, the effect is to leave the subject matter open to adoption for use as a mark by others. Vandenburgh III, Trademark Law and Procedure, 282 (2d ed. 1968); 3 Callman, Unfair Competition, Trademarks and Monopolies, § 76.-2(c) (3d ed. 1969). It may be seized immediately and the person so doing acquires a right superior to the entire world. 3 Callman, supra at § 79.4.

■ Objective evidence of abandonment outweighs a party's testimony that there was no intent to abandon a mark. "If all a party had to do to avoid a holding of abandonment was to testify that he never had any intent to abandon the mark, then no mark would ever be held abandoned." McCarthy, *Trademarks and Unfair Competition*, Vol. 1, § 17:3C (1973).

"A party's testimony that he had no intent to abandon may be outweighed by his actions, which may speak louder than his words: '[T]he purely subjective intention in the abandoner's mind to re-engage in a former enterprise at some indefinite future time is not sufficient to avoid abandonment where an objective analysis of the situation furnishes ample evidence to warrant the inference of abandonment.'" *Id.*

The November 10 communication from Kiefer was not equivocal. It stated that the Kitty Clover brand name "will be eliminated" and it further stated: "All items will be under the Hiland label." All items in the enclosed price list were Hiland brand products. It is hard to imagine how a public declaration of discontinuance of a trademark could be more clear.

■ Hiland contends that Mr. Kiefer was not authorized by Mr. Balagna to make the statements. However, Mr. Balagna saw the communication and did nothing to retract it. The failure of a principal to repudiate an agent's unauthorized act of which he gains knowledge ratifies that act, binding the principal. *See Weber v. Towner County*, 565 F.2d 1001, 1008 (8th Cir. 1977); Restatement (Second) of Agency, § 94 (1958).

■ The court finds as an ultimate fact that Cardinal, acting through Mr. Balagna and Mr. Kiefer, beginning the Friday before November 10, 1980, and continuing through the date shortly thereafter that Culbro began distributing Kitty Clover chips in the Kansas City trade area, discontinued use of the Kitty Clover mark in the Kansas City trade area with an intent not to resume its use.

Assuming, arguendo, a lack of intent on the part of Cardinal not to resume use of the Kitty Clover mark, the court finds and concludes that Hiland is equitably estopped from denying such an intent.

■ A party seeking to apply the doctrine of equitable estoppel must establish: (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance, in good faith, upon the misleading conduct or false representations of the party to be estopped; and (3) change in position based thereon to his injury, detriment or prejudice. *United States v. Aetna Cas. & Sur. Co.*, 480 F.2d 1095, 1099 (8th Cir.1973). The doctrine has been applied in trademark infringement suits to prevent a party from taking positions in that suit factually inconsistent with a prior position. *See Pacific Supply Coop. v. Farmers Union Central Exchange, Inc.*, 318 F.2d 894, 896, 906 (9th Cir.1963) (Pacific estopped from claiming exclusive license to use trademarks in trade area); *Holly Hill Citrus Growers' Ass'n v. Holly Hill Fruit Products, Inc.*, 75 F.2d 13, 17 (5th Cir.1935) (corporation estopped from denying transfer of trademarks to another corporation); *Puritan Sportswear*

*Corp. v. Shure,* 307 F.Supp. 377, 389 (W.D. Pa.1969) (plaintiff estopped from arguing that garments sold by defendant were not of same quality as those sold by plaintiff in retail market). As set forth in *Holly Hill Citrus Growers' Ass'n v. Holly Hill Fruit Products, Inc., supra,* 75 F.2d at 17:

> There is a kind of evidential estoppel which, though it may not amount to a complete estoppel in pais, is raised when persons who have spoken or acted one way under one set of circumstances, and with one objective in mind, undertake under other circumstances and when their objective has changed, to testimonially give a different color to what they formerly said and did.

■ Culbro has established the essential elements of estoppel to preclude Hiland from asserting that Cardinal did intend to resume use of the Kitty Clover trademark. Culbro has proved that it had no knowledge or means of knowing that Cardinal intended the opposite of the declarations in the Kiefer communication, that it relied in good faith on those declarations, and that it changed its position in reliance on those declarations to its detriment.

Cardinal's protestations of infringement came after Culbro changed its position in reliance on the November 10 communication.

Because of the foregoing findings and conclusions, the assignment in gross issue is not reached, and Hiland's September 29, 1982, motion to strike that issue is moot and not ruled on.

### ORDER

Counsel for Culbro is directed to promptly prepare and submit a proposed judgment in accordance with the foregoing findings and conclusions and paragraph 5 of the stipulation and order entered herein on August 26, 1982.